■ UBS Securities LLC, Appellant-Respondent, v Red Zone LLC, Respondent-Appellant. [910 NYS2d 55]—

Order, Supreme Court, New York County (Barbara R. Kapnick, J.), entered January 5, 2010, which denied plaintiff's motion for partial summary judgment on its first cause of action, unanimously reversed, on the law, with costs, the motion granted, and the matter remanded for further proceedings, including the calculation of expenses payable under the parties' agreement and interest. Cross appeal from same order, to the extent it denied defendant's motion for summary judgment dismissing the complaint, unanimously dismissed, without costs, for failure to perfect in the proper manner.

This appeal calls for the interpretation of an agreement by which plaintiff UBS, an investment bank, was engaged to act as the exclusive financial advisor to defendant Red Zone in the latter's effort to acquire control of Six Flags, Inc., a Delaware corporation. In 2004, Red Zone purchased approximately 8.76% of Six Flags' voting stock for $34.5 million. Daniel Snyder, Red Zone's managing member, believed Six Flags was operated poorly, and that his experience with other enterprises gave him insight into improving the company's performance. Accordingly, in September 2004, Snyder and David Pauken, another Red Zone member, met with Six Flags' nonmanagement directors to present ideas for managerial and operational changes. At the meeting, Red Zone asserted that Six Flags should (1) appoint

Snyder and two other nominees to its seven-person board of directors, (2) name Snyder as Six Flags' chair, (3) permit Snyder to select a CEO with marketing expertise and (4) adopt certain operational changes modeled on those Snyder had successfully employed as the chair and principal owner of a major sports franchise. Six Flags' directors, however, rejected all of these proposals for improving the business. Following the directors' rejection and some disappointing financial results, Red Zone decided to end its investment in Six Flags. The company's low stock price and trading volume, however, made it impossible for Red Zone to dispose of its sizeable stake in Six Flags on favorable terms. As a result, Red Zone decided to explore its own ways of fixing Six Flags.

In April 2005, Red Zone met with UBS to discuss its Six Flags investment. The parties considered several options, including seeking to influence Six Flags' board to take steps to maximize stock value, seeking Red Zone's representation on the board, or encouraging a sale of assets or a business combination such as Red Zone's acquisition of Six Flags. In May 2005, Snyder told Andrew Sriubas, a UBS managing director, that Red Zone "would like to control the board." On June 7, 2005, the parties entered into the advisory agreement that is the subject of this action.

The agreement designated UBS as Red Zone's exclusive financial and capital markets advisor in connection with a potential Six Flags "acquisition transaction," which provided for Red Zone's payment of UBS's expenses in addition to three separate fees. These fees included a transaction fee of $10 million, payable at the closing of an acquisition transaction, net of fees already paid. The transaction fee was payable if an acquisition transaction occurred within 18 months of the agreement's execution, i.e., by December 7, 2006. The term "acquisition transaction" was defined as follows: "As used in this Agreement, the term 'Acquisition Transaction' means, whether effected directly or indirectly or in one transaction or a series of transactions: (a) any merger, consolidation, reorganization or other business combination pursuant to which [Red Zone] and [Six Flags] and/or all or a significant portion of their respective businesses, divisions or product lines are combined, or (b) the acquisition by [Red Zone] of 50% or more of the capital stock or assets of [Six Flags] by way of tender or exchange offer, option, negotiated purchase, leveraged buyout, minority investment or partnership, joint or collaborative venture or otherwise, or (c) the acquisition by [Red Zone] of control of [Six Flags], through a proxy contest or otherwise."

By August 16, 2005, Red Zone had purchased additional shares, increasing its equity stake in Six Flags to 11.7%. At that time, however, Six Flags' bondholders would have had the right to demand the immediate repayment of approximately $2.6 billion in debt and preferred stock if Red Zone had merged with Six Flags or otherwise acquired more than 34.9% of its shares. Due to this "poison debt" and other factors, Red Zone concluded that absent a negotiated transaction with Six Flags, raising capital to finance an acquisition of the company would have been prohibitively expensive. Red Zone further ruled out a friendly negotiated transaction with Six Flags in light of its board's past intransigence.

On August 17, 2005, Red Zone launched what turned out to be a successful proxy contest by which the shareholders approved the replacement of three of Six Flags' seven directors with Snyder, Dwight Schar (another Red Zone member) and Mark Shapiro (Red Zone's recently hired CEO).[1] In November 2005, Six Flags' newly constituted board unanimously elected Snyder as its chair. On December 13, 2005, the board was expanded to 10 members with the addition of the late Jack Kemp, Harvey Weinstein and Michael Kassan. Snyder knew Kemp socially and had done business with Weinstein and Kassan. That same month, Six Flags' CEO was replaced by Mark Shapiro, who also continued to serve as Red Zone's CEO. At Shapiro's instance, Six Flags' board approved the hiring of 11 people for executive positions within the company. Three of the new executives had been on Red Zone's payroll when hired. On January 11, 2006, Six Flags' board unanimously voted to replace three of its pre-Red Zone directors with Pauken, C.E. Andrews and Mark Jennings. Pauken, as noted above, was a member of Red Zone and Andrews was nominated for membership on the board by Schar. Jennings held a membership interest in Red Zone through a limited partnership he controlled. Six Flags' board also approved the reimbursement of Red Zone's proxy contest expenses, which included Shapiro's compensation.

By this action, UBS seeks to recover a transaction fee on the ground that an acquisition transaction, consisting of Red Zone's acquisition of control of Six Flags, had occurred by January 11, 2006, a date within the term of the agreement. Plaintiff's contention that control was acquired is based upon the facts that

---

1. As set forth in a side agreement of the same date, it was understood that this proxy contest was not to be considered an "acquisition transaction" within the meaning of the advisory agreement.

- Red Zone's nominees held 9 of 10 seats on Six Flags' board,[2]

- over 50% of Six Flags' directors were Red Zone insiders,

- Snyder, Red Zone's managing member, was Six Flags' chair, and

- Shapiro, Red Zone's CEO, was also Six Flags' CEO.

Finding the advisory agreement ambiguous, the motion court denied plaintiff's motion for summary judgment on its contract cause of action. We now reverse.

The agreement manifestly provided for the payment of UBS's transaction fee upon Red Zone's acquisition of control of Six Flags. The parties disagree as to whether Red Zone acquired the requisite control of the company. This disagreement calls for interpretation of the term "control" as used in the agreement.

A contract is to be construed in accordance with the parties' intent, which is generally discerned from the four corners of the document itself (*MHR Capital Partners LP v Presstek, Inc.*, 12 NY3d 640, 645 [2009]). A "written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" (*Greenfield v Philles Records*, 98 NY2d 562, 569 [2002]). "Control," according to Black's Law Dictionary (9th ed 2009), is the "direct or indirect power to govern the management and policies of a person or entity, whether through ownership of voting securities, by contract, or otherwise" (*see also* Business Corporation Law § 912 [a] [8]; 8 Del Code § 203 [c] [4]). Red Zone clearly controlled Six Flags once its insiders and nominees constituted the majority of the board and took over the company's management. It cannot be disputed that Red Zone had seized the power to direct Six Flags' management and policies. We reject Red Zone's argument that it did not control Six Flags simply because it did not obtain ownership of the majority of its voting shares. The argument is at odds with the inclusive definition of "control" as well as the provisions of the advisory agreement. Moreover, the agreement provided that an acquisition transaction could have been brought about by way of a transaction in the nature of a merger, a stock acquisition or the acquisition of control "through a proxy contest or otherwise." Had the parties intended to limit the definition of "control" to the acquisition of stock, the phrase

---

**2.** As of January 18, 2006, Kassan resigned from the board without being replaced, leaving Red Zone's nominees with six of nine seats.

"through a proxy contest or otherwise" would have no meaning. Red Zone's argument is thus flawed because a contract should not be interpreted so as to render any of its clauses meaningless (*see Two Guys from Harrison-N.Y. v S.F.R. Realty Assoc.*, 63 NY2d 396, 403 [1984]). In addition, Red Zone's argument that the side agreement capped UBS's fee at $2 million is belied by a reading of the document itself. Because the advisory agreement and the side agreement are unambiguous, we decline to consider Red Zone's purported extrinsic evidence of the parties' intent (*see Greenfield*, 98 NY2d at 569-570).

We are similarly unpersuaded by Red Zone's argument that UBS was somehow required to rebut the presumption of good faith and loyalty on part of Six Flags' directors in order to establish control of the company on Red Zone's part. Here, Red Zone misplaces its reliance on *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v Stewart* (845 A2d 1040 [Del 2004]), a case that addresses the entirely distinct subject of demand futility in a derivative action. Taken to its logical conclusion, Red Zone's unlikely position would be that the parties here bargained for UBS's transaction fee to be payable upon, among other things, a breach of loyalty by at least some of Six Flags' directors.

We do not reach Red Zone's cross appeal because the record does not include the papers submitted with respect to its motion for summary judgment (*see* CPLR 5526). Meaningful appellate review of the denial of that motion has thus been rendered impossible. Having failed in its obligation to assemble a proper appellate record, Red Zone's cross appeal must be dismissed (*see Matter of Allstate Ins. Co. v Vargas*, 288 AD2d 309 [2001]). Concur—Mazzarelli, J.P., McGuire, DeGrasse, Freedman and Richter, JJ.