**REX MEDICAL L.P., Petitioner,**

v.

**ANGIOTECH PHARMACEUTICALS (US), INC., Respondent.**

No. 10 Civ. 8746(CM).

United States District Court, S.D. New York.

Dec. 1, 2010.

Joshua H. Epstein, Alan Stuart Gruber, Michael B. Roth, Sorinroyercooper LLC, New York, NY, for Petitioner.

## DECISION AND ORDER GRANTING PETITIONER'S MOTION FOR A PRELIMINARY INJUNCTION

McMAHON, J.

Presently before this Court is Rex Medical, L.P.'s motion for a preliminary injunction, seeking to enjoin Angiotech Pharmaceuticals (US), Inc. from terminating or otherwise cancelling an agreement between the parties that requires Angiotech Pharmaceuticals to market and distribute for a specified term a medical device invented by Rex Medical. For the reasons that follow, Rex Medical's request for a preliminary injunction in aid of arbitration is granted.

### I. BACKGROUND

Rex Medical ("Rex") is a privately held medical-device company that specializes in the design and development of innovative, minimally invasive medical devices. (Pet. For Inj. Relief Pending Arbitration ¶ 3.) Founded in 1999, Rex has 17 employees and approximately $7 to $8 million in total annual revenues. (*Id.*)

Angiotech Pharmaceuticals ("Angiotech") is a global pharmaceutical and medical-device company that markets and sells various medical products. (*Id.* ¶ 16.)

At issue in this case is a medical device named "The Rex Medical Option Retrievable Vena Cava Filter" or "Option" for short. Option is a medical device that is implanted into the body's inferior vena

cava (the large vein that carries de-oxygenated blood from the lower half of the body into the large atrium of the heart) to prevent life-threatening blood clots (known as pulmonary embolisms). (*Id.* ¶ 4.) It was invented and designed by Rex; accounts for 90 percent of Rex's current annual revenues; and is marketed and sold worldwide by Angiotech. (*Id.* ¶¶ 4–5.)

On March 13, 2008, Rex entered into a License, Supply, Marketing, and Distribution Agreement (the "Agreement") with Angiotech. (*Id.* ¶ 5.) The Agreement was effective on September 1, 2009, and runs until March 1, 2015. (*Id.* ¶ 7.)

Under section 2 of the Agreement, Rex granted Angiotech an exclusive license to market and distribute Option worldwide. (*Id.* ¶ 7.) Under section 3 of the Agreement, Angiotech is solely responsible for all sales and marketing of Option, and is required to maintain a 48–person sales force in the United States to support Option sales. (*Id.*) In exchange for the right to be the exclusive distributor of Option, Angiotech pays Rex certain license fees and "milestone" payments—all of which are outlined in section 6 of the Agreement. (*Id.* ¶ 8.) For instance, if during the first 18 months of the Agreement sales of Option exceed $15 million, Rex is owed a "milestone" payment of $1.5 million. (*Id.*) The parties expect that this "milestone" will be reached in mid-December 2010 and will be payable by Angiotech in January 2011.

Under section 8 of the Agreement, Angiotech has the unilateral right to terminate the Agreement—on 90 days' written notice—if Rex materially breaches the Agreement, Option loses its patent protection, or Rex becomes bankrupt or insolvent. (*Id.* ¶ 9.)

None of these conditions has occurred.

Section 10 of the Agreement contains a broad arbitration clause, which requires the parties to submit all disputes arising out of or relating to interpretation of the Agreement to arbitration. (Declaration of Lindsay L. Carter ("Carter Decl.") Ex. A, Section 10.)

On November 11, 2010, Dr. William Hunter, Angiotech's President and Chief Executive Officer, sent an e-mail message to Rex, informing the company that:

It is with considerable regret that I attach to this e-mail a letter terminating our agreement covering the Option Filter.... [U]nder the terms of the current distribution agreement, I can see no pathway for Angiotech to derive any meaningful economic return on Option over the limited time period for which we have rights to the product.... We will be disbanding a significant part of the Option sales force in the coming weeks and would like to do that in a respectful and orderly manner.

(*Id.* ¶¶ 6, 13.) The letter attached to Dr. Hunter's e-mail message states that "while Angiotech and our new financial backers see tremendous potential for Option, the product is not financially viable for Angiotech under the current contractual relationship" and, as a result, "as of November 30, 2010, Angiotech will cease sales of Option products and reallocate the substantial resources currently dedicated to Option to our other products." (*Id.* ¶ 14.)

Angiotech's brief in opposition to Rex's petition for a preliminary injunction explains in further detail the events that led to Dr. Hunter's e-mail. In 2008, Angiotech sought to expand its portfolio of vascular products while at the same time generating additional capital investment from outside sources in order to facilitate the company's goal of expanding its product offerings. In the hopes that it would receive the capital financing it required (but before any financing deal was secured), Angiotech entered into the March 13, 2008 Agreement with Rex.

Following the decline in the nationwide economy and the financial markets in fall 2008, Angiotech was unable to secure the additional financing it required (and had hoped to receive) when it first entered into the Agreement with Rex. Angiotech claims that the additional financing was a "necessary ingredient" to make the Agreement to distribute Option financially viable for Angiotech. (Angiotech's Br. at 6.)

In 2010, Angiotech's financial condition worsened, to the point where Angiotech announced, in September, that it would not make its October 1, 2010 interest payment of $9.7 million to the holders of its 7.75% Senior Subordinated Notes (the "Note Holders"). Failure to make the interest payment would have resulted in an event of default, but Angiotech's Note Holders agreed to exchange $250 million in face amount of notes for equity in Angiotech. Nonetheless, Angiotech continues to suffer financially.

On November 19, 2010, Rex moved by order to show cause for a temporary restraining order and a preliminary injunction enjoining Angiotech from terminating the Agreement pending the conclusion of arbitration proceedings commenced by Rex. The Court issued a temporary restraining order on November 19, and scheduled a hearing on Rex's preliminary injunction motion for November 29, 2010. For the reasons discussed below, Rex's motion for a preliminary injunction in aid of arbitration is granted.

## II. DISCUSSION

### A. *Rex's Request For A Preliminary Injunction Is Granted.*

In *Salinger v. Colting*, 607 F.3d 68, 74–75 (2d Cir.2010), the Second Circuit concluded that its "longstanding standard for preliminary injunctions ... is inconsistent with the 'test historically employed by courts of equity' and has, therefore, been abrogated by *eBay, Inc. v. MercExchange,*

*L.L.C.,* 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)." In *Salinger,* the court held that a preliminary injunction should issue upon a showing of a plaintiff's likelihood of success on the merits only where the plaintiff has also shown that: (1) "he is likely to suffer irreparable injury in the absence of an injunction"; (2) "remedies at law, such as monetary damages, are inadequate to compensate for that injury"; (3) the balance of hardships tips in his favor; and (4) "the 'public interest would not be disserved' by the issuance of a preliminary injunction." *Id.* at 80 (quoting *eBay,* 547 U.S. at 391, 126 S.Ct. 1837). Although the *Salinger* court indicated that its holding was "limited to preliminary injunctions in the context of copyright cases," the court also stated that it saw "no reason that *eBay* would not apply with equal force to an injunction in *any* type of case." *Salinger,* 607 F.3d at 78 n. 7 (emphasis in original). As this Court explained in *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.,* 704 F.Supp.2d 305, 328 (S.D.N.Y.2010), I believe that *eBay* requires the use of the Supreme Court's four-factor test in every case. Accordingly, this Court analyzes Rex's request for a preliminary injunction by applying the four-factor test of *eBay* and *Salinger.*

There is a further complication in this case. The parties underlying dispute over Angiotech's right to terminate the Agreement must go to arbitration. No one disputes this. The Court is being asked only to issue an injunction so that the arbitration can go forward before there is a change in the status quo.

The Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 1 et seq., requires that courts "enforce privately negotiated agreements to arbitrate ... in accordance with their terms." *Volt Info. Scis., Inc. v. Leland Stanford, Jr. Univ.,* 489 U.S. 468,

478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). The Second Circuit has recognized that a courts' power to compel arbitration is meaningless without the power to also issue injunctive relief when necessary to maintain the status quo during arbitration. *See, e.g., Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith,* 910 F.2d 1049, 1053 (2d Cir.1990). As the Circuit explained in *Blumenthal,* "Arbitration can become a 'hollow formality' if parties are able to alter irreversibly the status quo before the arbitrators are able to render a decision in the dispute." *Id.* As noted by one court in this district, "temporary restraining orders and preliminary injunctions may be, and frequently are, granted in aid of arbitration claims where necessary to avoid irreparable injury." *Banus v. Citigroup Global Mkts. Inc.,* 2010 WL 1643780, at *8 (S.D.N.Y. Apr. 23, 2010). Thus, this Court has the power to grant, if appropriate, the relief Rex seeks: a preliminary injunction enjoining Angiotech from terminating the Agreement (and maintaining the status quo) pending resolution of the arbitration. *See, e.g., Credit Suisse Secs. (USA) LLC v. Ebling,* 2006 WL 3457693, at *3 (S.D.N.Y. Nov. 27, 2006).

The standard for issuance of a preliminary injunction in aid of arbitration and issuance of a preliminary injunction generally is the same. *Blumenthal,* 910 F.2d at 1054; *see also Swiss Skies AG v. Air Luxor, S.A.,* 2010 WL 3219295, at *3 (S.D.N.Y. Aug. 13, 2010); *Suchodolski Assocs., Inc. v. Cardell Fin. Corp.,* 2003 WL 22909149, at *3 (S.D.N.Y. Dec. 10, 2003) (citing cases). As discussed below, Rex has satisfied all of the factors necessary for the issuance of a preliminary injunction in aid of arbitration.

### 1. Irreparable Harm and Monetary Damages

■ "The showing of irreparable harm is perhaps the single most impor-tant prerequisite for the issuance of a preliminary injunction." *Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) (internal quotation marks and citations omitted). A movant can establish irreparable harm if it shows that "there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Id.* (internal quotation marks and citations omitted). Monetary loss is insufficient; a party seeking a preliminary injunction must show "evidence of damage that cannot be rectified by financial compensation." *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir. 1989); *see also Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,* 60 F.3d 27, 37 (2d Cir.1995).

■ Moreover, the irreparable harm alleged must be shown to be "actual and imminent, not remote or speculative." *Kamerling,* 295 F.3d at 214. The "mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction." *Borey v. Nat'l Union Fire Ins. Co.,* 934 F.2d 30, 34 (2d Cir.1991). A company's "loss of reputation, good will, and business opportunities" from a breach of contract can constitute irreparable harm. *Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 404 (2d Cir.2004).

Typically, cases where courts have found irreparable harm from a loss of goodwill or business relationships have involved situations where the dispute between the parties leaves one party unable to provide its product to its customers. For instance, in *Reuters Ltd. v. United Press Int'l,* 903 F.2d 904 (2d Cir.1990), the Second Circuit concluded that United Press had shown irreparable harm because, if Reuters were allowed to terminate the parties' agreement, United Press would be unable to continue supplying its product (provided to

it by Reuters) to its customers. In that case, Reuters had contracted with United Press to provide it with foreign news photographs which United Press would later distribute to its customers. *Id.* at 905. In concluding that United Press had shown irreparable harm sufficient to warrant the issuance of an injunction, the court focused on the harm to United Press's reputation and the loss of goodwill, and noted that such an injury is "nearly impossible to value." *Id.* at 908. "In cases where a preliminary injunction has issued to prevent a product source from suspending delivery to a distributor, the irreparable harm has often consisted of the loss of customers and the competitive disadvantage that resulted from a distributor's inability to supply its customers with the terminated product." *Id.* at 909; *see, e.g., John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.,* 588 F.2d 24, 29 (2d Cir.1978) (irreparable injury shown when "plaintiff is deprived totally of the opportunity to sell an entire line of merchandise and may incur injury to its goodwill and reputation 'as a dependable distributor' "); *see also Supermarket Serv., Inc. v. Hartz Mountain Corp.,* 382 F.Supp. 1248, 1256 (S.D.N.Y.1974); *Interphoto Corp. v. Minolta Corp.,* 295 F.Supp. 711, 723–24 (S.D.N.Y.1969).

In *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,* 60 F.3d 27 (2d Cir.1995), the Second Circuit provided the following guidance for determining whether the loss of goodwill is evidence of irreparable harm:

> Generally, where we have found no irreparable harm, the alleged loss of goodwill was doubtful, and lost profits stemming from the inability to sell the terminated product could be compensated with money damages determined on the basis of past sales of that product and of current and expected future market conditions. In contrast, where we have found irreparable harm, the very

viability of the plaintiffs business or substantial losses of sales beyond those of the terminated product have been threatened.

*Id.* at 38 (internal citations omitted).

■ Rex has shown that it will suffer irreparable harm absent the issuance of an injunction. It is undisputed that Angiotech is the sole worldwide distributor of Option. (Carter Decl. Ex. A.) If Angiotech is allowed to stop selling Option, it is also undisputed that Option will cease to be sold for as long as it takes Rex to find a replacement distributor—a process that undoubtedly cannot occur overnight, and certainly not in the 19–day notice period Angiotech offered to Rex. As a result, Rex's product will be off the market entirely—no doubt leading its customers to purchase a competing product and perhaps resulting in a permanent loss of business. In *Reuters,* the court explained that "terminating the delivery of a unique product to a distributor whose customers expect and rely on the distributor for a continuous supply of that product almost inevitably creates irreparable damage to the good will of the distributor." 903 F.2d at 907–08. Terminating the supply of Option to users of that product will negatively impact Rex's goodwill and business reputation, because customers will have no choice but to resort to using a substitute product to meet their needs—possibly resulting in a permanent loss of business.

Angiotech points to three other medical devices developed by Rex to argue that Rex's business will continue even if it cannot sell Option for a temporary period of time. This argument, however, misses the point. Because Option comprises 90 percent of Rex's business, depriving it of 90 percent of its revenues will force Rex to cut its workforce and severely impact its profitability. A company that loses 90

percent of its business overnight tends to go out of business.

In *Reuters*, the Second Circuit concluded that United Press had met its burden of showing irreparable harm because United Press's inability to provide its customers with foreign news photographs (only one of the services it offered its customers) would injure United Press's "reputation and good will in the news industry" and "an injury of this sort is nearly impossible to value." 903 F.2d at 908. For the same reason, Rex's ability to sell other medical devices does not negate irreparable harm. Option is obviously Rex's best-selling product; it accounts for all but 10 percent of Rex's revenue. As was true in *Reuters*, if the distribution of Option is disrupted, Rex's customers will seek out a competing product to meet their needs—costing Rex market share, goodwill, and future sales.

While it may be true that Rex will eventually find an alternative distributor, (Angiotech's Br. 19), completely halting the sale of Option will harm Rex's reputation and goodwill in ways that cannot be valued. *See, e.g., Reuters*, 903 F.2d at 909; *Tom Doherty Assocs.*, 60 F.3d at 37–39. "Irreparable harm is found where, 'but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied.'" *O.D.F. Optronics Ltd. v. Remington Arms Co.*, 2008 WL 4410130 (S.D.N.Y. Sept. 26, 2008) (quoting *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir.1999)). As the court noted in *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 588 F.2d 24, 29 (2d Cir.1978), depriving a party of "the opportunity to sell an entire line of merchandise," may cause that party to "incur injury to its goodwill and reputation as a dependable distributor." During Rex's absence from the market, its customers will resort to competing products to fill their needs, and, even after Rex's return, customers may nonetheless refuse to return to Rex, because of Rex's lack of dependability in supplying its product.

Thus, Rex has shown that it will suffer irreparable harm absent the issuance of an injunction and that such harm cannot be compensated with an award of monetary damages. As such, Rex has satisfied two of the *Salinger* factors necessary for the issuance of an injunction.

### 2. *Likelihood of Success on the Merits*

■ In the upcoming arbitration, Rex seeks a declaration that Angiotech's notice of termination is invalid, and constitutes a material breach of the parties contract, for two reasons: (1) Angiotech had no legitimate reason to terminate the contract; and (2) assuming *arguendo* that one of the conditions for termination was met, Angiotech failed to give 90 days' notice of termination as required by section 8 of the Agreement. Rex has established to the satisfaction of this Court that it is likely to succeed on the merits of its claim in arbitration. It thus satisfies the second prong for issuance of an injunction in aid of arbitration.

■ In New York, to establish a breach-of-contract claim, a plaintiff must prove: (1) the existence of a contract, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages resulting from the breach. *See O.D.F. Optronics*, 2008 WL 4410130, at *8. The parties do not dispute the existence of the contract, the adequacy of Rex's performance thereunder or the fact that Rex will suffer damages (whether irreparably or not) if Angiotech's abrupt termination of the Agreement is a breach. The only thing in dispute is whether Angiotech has the right to terminate the contract at all, or on short notice.

Rex is likely to prevail on its claim that Angiotech may not unilaterally terminate the Agreement at all, because it lacks a legitimate reason to do so. Angiotech's right to unilaterally terminate the Agreement is governed by section 8, which provides that Angiotech may do so only in three circumstances:

> (1) Rex materially breaches its obligations, representation or warranties under the agreement; (2) Option no longer has a valid and enforceable patent in the United States; or (3) Rex becomes bankrupt or insolvent, enters into liquidation or dissolution proceedings, or there is a change in control as defined in the agreement.

(Carter Decl. Ex. A, section 8(B).) There is no evidence in the record presently before the Court that any of those three circumstances has arisen.

Angiotech argues that it does have the right to terminate the Agreement unilaterally on short notice, because such a right is conferred under section 3 of the Agreement, which provides:

> Angiotech shall in its sole discretion decide on the manner in which it executes on any and all activities related to the commercialization of [Option]. Angiotech agrees that it shall use Commercially Reasonable Efforts to carry out the marketing and commercialization of [Option] in the Field throughout the Territory.

(Carter Decl. Ex. A, section 3(A).) Angiotech says that it has become commercially unreasonable for it to continue to market Option, since it is losing money under the terms of the Agreement—and that section 3 thus gives it the right, in its sole discretion, to stop marketing the product without breaching the Agreement.

This is utter and complete nonsense.

■ Under New York (and every other state's) law, parties are not free to interpret a contract in a way that frustrates the purpose of that contract or that makes any provision of the contract meaningless. *See, e.g.,* 11 Williston, Contracts, § 32:9 (4th ed. 2009); *UBS Securities LLC v. Red Zone LLC,* 77 A.D.3d 575, 578, 910 N.Y.S.2d 55 (2010). The purpose of the Agreement is to accomplish the marketing of Option by outsourcing it to Angiotech. If Angiotech can simply stop marketing Rex's product without breaching the Agreement, the purpose of the Agreement is frustrated and the entire document becomes nonsense. A far more sensible reading of section 3 is that it gives Angiotech the unilateral right to decide how to market the product, not whether to market the product.[1]

Furthermore, it is a settled maxim of contract construction that the specific controls the general—*i.e.,* where the contract contains a provision that specifically addresses a particular contingency (such as unilateral termination), that provision must be relied on rather than some other, more general provision. *See, e.g., Rensselaer Polytechnic Institute v. Varian, Inc.,* 340 Fed.Appx. 747, 749 (2d Cir.2009) (concluding that a party's right to terminate the contract was limited to the contract's termination provision and not general language in another provision of the agreement); *see also* 11 Williston, Contracts, § 32:11 (4th ed. 2009) ("A contract must be construed as a whole and the intention of

---

**1.** Even this right is subject to certain contractual limitations. For example, Angiotech is required to maintain a minimum sales force of 48 persons at all times during the pendency of the Agreement. (Carter Decl. Ex. A, section 3(A).). Angiotech thus cannot unilaterally decide to cut its sales force (and certainly not to cut it to zero). What Angiotech can decide is what measures that sales force needs to take to market the product in a commercially reasonable manner.

the parties is to be collected from the entire instrument and not from detached portions."). Here, section 8 sets out specific conditions under which Angiotech can unilaterally terminate the Agreement. Pursuant to this familiar rule of contract construction, those reasons are the ONLY reasons why Angiotech can unilaterally terminate the Agreement.

Since Angiotech's section 3 argument is not likely to succeed in arbitration, its termination right is also subject to the provision in section 8 that requires it to give 90 days' notice. Therefore, even if Angiotech can establish a basis for unilaterally terminating the Agreement, it is unlikely to demonstrate that termination can be accomplished on lesser notice.

Thus, Rex has shown a likelihood of success on the merits sufficient to warrant the issuance of a preliminary injunction in aid of arbitration.

### 3. *Balance of Hardships*

▉ "A court must consider the balance of hardships between the plaintiff and defendant and issue an injunction only if the balance of hardships tips in the plaintiff's favor." *Salinger,* 607 F.3d at 80 (citing *Winter v. Natural Res. Defense Council,* 555 U.S. 7, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008); *eBay, Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)).

▉ Rex argues that the balance of hardships tips in its favor, because if Angiotech is allowed to cease selling Option, Rex's customers will be unable to purchase Option (even if only temporarily), thus harming Rex's goodwill and reputation and costing Rex sales from a product that accounts for 90 percent of its revenue. In response, Angiotech argues that if it is forced to continue performing its obligations under the Agreement, its financial condition will worsen. Angiotech alleges that it suffers approximately $ 1 million in

monthly losses from the sale of Option, and that its continued performance of the Agreement could ultimately lead it to file for bankruptcy.

Rex is asking the Court to issue an injunction to preserve the status quo until the parties have an opportunity to resolve their dispute in arbitration, as provided in the Agreement. (Carter Decl. Ex. A section 10.) Angiotech entered into this contractual distribution Agreement with Rex voluntarily. Although with the benefit of hindsight Angiotech may realize that the Agreement is unprofitable, that realization does not relieve Angiotech of its obligations under the Agreement.

The Agreement's unprofitability for Angiotech does not mean that Rex should suffer irreparable harm to reduce Angiotech's losses from performance of its contractual obligations. In essence, by entering into the Agreement, in exchange for the intended benefits of distributing Option, Angiotech assumed the risk that the distribution of Option would be unprofitable and expressly agreed that Rex would be entitled to seek "injunctive relief so as to maintain the status quo." (Carter Decl. Ex. A section 10(d).)

Angiotech supports its attempt to circumvent its contractual obligations by arguing that performance of the Agreement is a severe hardship on the company. This is an argument Angiotech should save for a bankruptcy court—if it seeks bankruptcy protection—and does not support a conclusion that Rex should bear the burden of Angiotech's poor decisionmaking. The crux of Angiotech's argument is that Rex should bear the cost of its mistakes even though Rex is not to blame for Angiotech's fragile financial state. That result is not equitable. Rex should not have to suffer irreparable harm to save Angiotech from its self-imposed fate. Accordingly, the

Court finds that the balance of hardships tips in Rex's favor.

### 4. The Public Interest

 Having concluded that all three other factors favor injunctive relief, the Court's sole remaining task is to confirm that granting injunctive relief would not disserve the public interest. *See Salinger*, 607 F.3d at 79–80. "In general, public policy holds competent contracting parties to bargains made by them freely and voluntarily, and requires the courts to enforce such agreements." *Cuciniello v. Cuciniello*, 85 Misc.2d 454, 378 N.Y.S.2d 976, 977 (N.Y.Sup.Ct.1976). Here, Angiotech voluntarily entered into a distributorship with Rex. All that the Court is being asked to do is to enforce the parties' bargained-for right to arbitrate any disputes that arise under the Agreement. The public has an interest in seeing that parties oblige by their contractual obligations and are not allowed to skirt such obligations at another's expense. *See, e.g., Miller v. Cont'l Ins. Co.*, 40 N.Y.2d 675, 679, 389 N.Y.S.2d 565, 358 N.E.2d 258 (1976) ("[T]he usual and most important function of courts of justice is rather to maintain and enforce contracts, than to enable parties thereto to escape from their obligation on the pretext of public policy."). Thus, this factor also favors the issuance of an injunction to enforce the parties' Agreement to arbitrate.

### B. Conditions on Injunctive Relief

Angiotech asks this Court to condition any grant of an injunction on Rex posting a security bond in the amount of $5 million. Angiotech asserts that its continued performance of the Agreement during the pendency of the arbitration will cost Angiotech between $1.1 and $1.2 million in losses on a monthly basis (for approximately the 3 months it will take for an arbitration to conclude) and a $1.5 million "milestone" payment that may be due to Rex while the arbitration is pending. Thus, Angiotech estimates that it will suffer approximately $5 million in losses from continued performance of the Agreement. In the event that Angiotech prevails in the arbitration, Angiotech argues that a security bond in that amount is necessary to protect its creditors.[2]

 Under Federal Rule of Civil Procedure 65(c), "The court may issue a preliminary injunction ... only if the movant gives security in an amount that the court considers proper ...." Fed.R.Civ.P. 65(c). "It is well-settled that a district court has 'wide discretion in the matter of security and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm.'" *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F.Supp.2d 305, 345 (S.D.N.Y.2010) (quoting *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir.1996)); *see also Clarkson Co. v. Shaheen*, 544 F.2d 624, 632 (2d Cir.1976). "The purpose of [Rule 65(c) ] is to enable a restrained ... party to secure indemnification for the costs ... and pecuniary injury that may accrue during the period in which a wrongfully issued equitable order remains in effect." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2954 (2d ed. 1995). As the Second Circuit explained, "The injunction bond is designed 'to cover any damages that might

---

**2.** Angiotech is contractually obligated to make the "milestone" payment if certain conditions are met. As such, the "milestone" payment is not a "loss" Angiotech incurs from distributing Option. Rather, the "milestone" payment is a contractual obligation that Angiotech is required to satisfy until such time as an arbitral tribunal concludes that Angiotech's termination of the Agreement was proper.

result if it were later determined that [the applicant] was not entitled to an injunction.'" *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith,* 910 F.2d 1049, 1055 (2d Cir.1990) (quoting *Commerce Tankers Corp. v. Nat'l Mar. Union,* 553 F.2d 793, 800 (2d Cir.1977)).

Here, I have already concluded that Angiotech is highly unlikely to prevail in arbitration; that militates against the posting of *any* bond. Also, Angiotech merely argues that if it is required to comply with the terms of an Agreement that it entered into advisedly and voluntarily, it will be damaged. If the arbitrator concludes that Angiotech's purported termination of the Agreement was proper, it is of course true that Angiotech's continued performance of the Agreement *pendent lite* may hasten the company's financial downfall, to the detriment of the company and its creditors. However, if the arbitrator rules as this Court believes he will rule, then the "damage" to Angiotech is nonexistent, because being forced to comply with contractual obligations that a party voluntarily entered into is simply not the sort of "damage" that is compensable at law.

It is within the Court's discretion to set the amount of the security bond, *See Corning Inc. v. PicVue Elec., Inc.,* 365 F.3d 156, 158 (2d Cir.2004). I believe it equitable to discount Angiotech's purported "damages" (limited to its anticipated losses for continuing to market the product) by my estimate of the probability that such an outcome will in fact come about—and I conclude that the probability of such a ruling from the arbitrator is less than 5%. I thus conclude that a bond in the amount of $100,000 should be more than adequate to protect whatever potential losses Angiotech faces from the entry of the injunction in aid of arbitration. This represents a reduction from the amount indicated in my preliminary order of yesterday, November 30, 2010, but on further reflection I believe it to be the correct amount.

Rex must post its bond by December 11, 2010, or the injunction ordered by this opinion will be vacated.

I believe it is appropriate to add one additional term to the injunction that Rex seeks. Rex's injunction should be conditioned on an expedited arbitration. Arbitration can take forever, and Angiotech appears to be in dire financial straits. It would be inequitable if this injunction in aid of arbitration resulted in an unduly lengthy delay of the resolution of this dispute—and of the parties' relationship.

Under the parties' Agreement, Rex has the right to terminate the contract unilaterally if Angiotech commits a material breach. (Carter Decl. Ex. A section 8(B)(i).) In the event of a termination by either party, Angiotech is required to continue to market Option for a period of 180 days—a period obviously negotiated to allow Rex to put some other distribution scheme in place. Since Rex will argue to the arbitrator that Angiotech has committed what has to be a material breach of the contract (which gives it the unilateral right to terminate the contract), the Court concludes that it would be inequitable to permit the injunction to run for longer than the period bounded by this provision. Accordingly, this injunction in aid of arbitration will expire by its terms 180 days after November 11, 2010, or May 12, 2011— November 11 being the date Angiotech informed Rex that it was terminating the Agreement.

This constitutes the decision and order of the Court. Rex shall submit a form of order for the Court's signature.