[994 NYS2d 764]

RED ZONE LLC, Plaintiff, v CADWALADER, WICKERSHAM & TAFT LLP, Defendant.

Supreme Court, New York County, August 27, 2013

**APPEARANCES OF COUNSEL**

*Jeffrey A. Jannuzzo* and *Hinman Straub P.C.* (*James T. Potter* of counsel) for plaintiff.

*Cravath, Swaine & Moore LLP* (*David R. Marriott* of counsel) for defendant.

### OPINION OF THE COURT

MELVIN L. SCHWEITZER, J.

The plaintiff claims that the defendant committed legal malpractice. The plaintiff has moved for summary judgment. The defendant opposes the plaintiff's motion for summary judgment and moves for summary judgment against the claims.

### Background

#### Facts Relating to Malpractice

The court finds the following facts relating to the issue of legal malpractice. While Cadwalader, Wickersham & Taft LLP disputes several points, it has not introduced evidence that is sufficient to demonstrate any material issue of fact with the following account.

In 2004, Red Zone LLC retained Cadwalader to advise it in connection with a potential acquisition of the entertainment company, Six Flags, Inc. Dennis Block, a partner at Cadwalader, was the attorney who had primary responsibility for the matter. Red Zone then owned approximately $34.5 million or 8.76% of Six Flags' common voting stock.

In April 2005, Red Zone met with the investment bank, UBS Securities LLC to discuss Red Zone's investment in Six Flags. On June 7, 2005, Red Zone and UBS signed a seven-page agreement (engagement agreement) detailing the role that UBS would play in assisting Red Zone with a potential acquisition transaction of Six Flags. Cadwalader advised Red Zone in connection with the engagement agreement. The engagement agreement stated that Red Zone would pay UBS a $10 million fee if an "Acquisition Transaction" was completed by December 7, 2006. The engagement agreement provided that an "Acquisition Transaction" could be accomplished by (a) a transaction in the nature of a merger, (b) a stock acquisition, or (c) the acquisition of control "through a proxy contest or otherwise."

On August 16, 2005, Red Zone and UBS had developed a plan to launch a consent solicitation with the goal of providing Red Zone with three of the seven director positions at Six Flags. Red Zone had also acquired additional common shares of Six Flags, raising their common voting stock stake to 11.7%.

Just prior to the launch of the consent solicitation, UBS personnel informed Red Zone that it would demand a $10 million fee if the consent solicitation was successful. Red Zone took

the position that UBS's request was "absurd" and not the intent of the engagement agreement. Red Zone threatened not to go forward with the consent solicitation. This dispute took place at Cadwalader's office, and Red Zone's only counsel present was Cadwalader.

Mr. Block was present when representatives of Red Zone and UBS reached an oral agreement (side agreement) and shook hands on a deal that would result in the consent solicitation going forward.

Mr. Snyder, the managing member of Red Zone, stated in his affidavit that the parties' side agreement limited "Red Zone's liability for fees to UBS for the Six Flags transaction at $2 million for anything that did not involve Red Zone acquiring a majority [of the] stock of Six Flags." Mr. Block testified, in a deposition in a previous case, to the following description of the negotiation:

> "We were in a room and Dan [Snyder] was quite, Mr. Snyder was quite agitated over the fact that, and he started the discussion by saying, just to bring me up to date, that Mr. Sriubas [of UBS] had recognized that if there was a proxy contest, a consent solicitation, as opposed to an acquisition of the business, that UBS would get only $2 million in fees and that his people, Sriubas' people were quite unhappy with that and felt they had done a lot of work and had earned a much bigger fee already . . . .
>
> "And the question was should or could he give more money to UBS and Dan said, and he said it in very loud and not so nice words, that he was leaving, that he was not going forward with the proxy contest, that his total investment in what he was now characterizing as a disaster, was something less than $40 million and that you don't pay $10 million . . . in order to protect $40 million by getting yourself elected to a board where you're not going to have an ability to do very much in any event.
>
> "Dan was unwilling to pay any more money and basically said he was leaving. They asked, and they being [the UBS representatives] Mr. Le Brun, Mr. Sine, and Mr. Sriubas, if they could excuse themselves from the room for a few minutes so that they could talk and then they'd come back.
>
> "[T]hey came back in the room, Mr. Sine said, in essence that he didn't think this was fair but he would agree to do the $2 million and he would hope that

somewhere down the road Mr. Snyder could see his way to do something more. Mr. Snyder made no commitment to do anything. He said fine, let's go next door and go back to work.

"At that point I asked [Andrew] Sriubas and I asked Andy Schleimer, who was one of Mr. Sriubas' people, and Bill Mills, one of my people, to come into the room, we told them exactly what transpired during the meeting and we told them because we didn't want any confusion with respect to what you and I had been talking about on Page 1 of the engagement letter, to amend the engagement letter so to take out any concept or any context [sic] of proxy contest as a means of their [sic] being a payment in excess of 2 million."

Following the meeting, Mr. Snyder instructed Mr. Block to memorialize the side agreement into a written document that would be binding on UBS. On August 17, a document (side letter) was reviewed by Cadwalader and presented to Mr. Snyder. On August 17, 2005, Mr. Snyder signed the side letter on behalf of Red Zone. Representatives of UBS also signed the side letter.

Mr. Andrew Sriubas, one of the UBS representatives who signed the side letter, testified in the previous case that the following described their understanding of the side agreement:

"When I signed the August 17 Amendment on behalf of UBS, representatives of UBS and Red Zone had struck a deal that UBS was to receive only a $2 million fee in connection with Red Zone's engagement of UBS relating to Six Flags, and that Red Zone had the option, but not the obligation, to pay an additional amount to UBS in Red Zone's sole discretion.

"As a UBS representative and a signatory of the August 17 Letter, I understood that if the proposed Red Zone consent solicitation were to be successful, the newly-appointed members of the Six Flags Board would seek to expand their influence on the board and with the company, and that this would not trigger the payment of any additional fee to UBS other than in Red Zone's sole discretion."

The side letter itself simply stated that "the term 'acquisition transaction' does not include the Company's proposed consent solicitation to replace three of the acquisition candidate's seven directors announced on or about the date hereof."

Mr. Block also testified in a deposition that the purpose of the side letter was "to make clear the parties' agreement that UBS would not get more than $2 million unless 51 percent of the stock was acquired by Red Zone." Mr. Block repeated this in even more firm words when he explained that the $10 million was, "off the table period . . . unless they did an acquisition of more than 50 percent stock within the tail period, they would not get more than $2 million."

Mr. Block saw the side agreement and the side letter as a clarification (or reiteration) of rights that were already apparent in the original engagement agreement. In the previously quoted deposition, he stated,

> "Andy Sriubas [of UBS] and I both agreed that we really didn't need a letter, that the original agreement, the engagement letter, didn't provide a right to receive more than $2 million in connection with the proxy contest or anything coming out of the proxy contest. The only reason this document was drafted was because Andy . . . insisted they had a right, though we believe it was not ambiguous, it was essential that something be written to clarify that."

Mr. Block then clarified how the August 17 side letter related to the earlier engagement agreement and said, "we were now making it as clear as the parties could make it that that was what the old agreement meant."

On August 17, 2005, the consent solicitation went forward successfully and Red Zone secured three of seven director positions. Over the next 18 months, UBS went on to attain a much greater position on Six Flags' board of directors. By January 11, 2006, Red Zone nominees held 9 out of 10 of the Six Flags board positions. Over 50% of Six Flags' directors were Red Zone insiders. Mr. Snyder held the position of Six Flags chairman. Mr. Shapiro, Red Zone's chief executive officer was also Six Flags' chief executive officer.

On May 22, 2007, UBS sent a letter to Red Zone demanding the remainder of the $10 million fee, which UBS would be entitled to in the event of an acquisition transaction. Red Zone contacted Cadwalader for assistance on the matter, but later hired alternative trial counsel.

The dispute between Red Zone and UBS resulted in litigation. The New York Supreme Court denied summary judgment to both parties. On appeal, the First Department reversed, granting summary judgment to UBS. (*UBS Sec. LLC v Red*

*Zone LLC*, 77 AD3d 575 [1st Dept 2010].) The Court determined that Red Zone controlled Six Flags through its presence on its board and management. In making this finding the Court relied on a dictionary definition of the term control, because the engagement agreement did not provide for a more specific definition. The Court noted that, as defined in the engagement agreement, an acquisition transaction included gaining control, "through a proxy contest or otherwise." (*Id.* at 576.) The Court concluded that because Red Zone had acquired control, the terms of the engagement agreement dictated that Red Zone owed UBS the fee. Finding no ambiguity in the engagement agreement, the Court declined to consider parol evidence relating to the engagement agreement. The Court considered the side letter and found that the claim that the letter capped the fee "is belied by a reading of the document itself." (*Id.* at 579.)

Red Zone moved for leave to appeal to the Court of Appeals from the decision of the First Department, but the motion was denied by order entered June 30, 2011. (*UBS Sec. LLC v Red Zone LLC*, 17 NY3d 706 [2011].) In the appeal, Red Zone referred to the First Department's definition of control as "a radical departure—a departure from prior New York case law, from widely accepted principles of corporate law, and from common sense."

Facts Relating to Continuing Representation

The court finds the following facts relating to the issue of continuing representation. In 2004, Red Zone hired Cadwalader to advise it in connection with a potential acquisition of Six Flags. There was no retainer agreement between Red Zone and Cadwalader for any part of the Six Flags representation.

On June 7, 2005, Cadwalader advised Red Zone when it entered into the engagement agreement with UBS. On August 16, 2005 Cadwalader attended the negotiation between UBS and Red Zone, and was directed by Red Zone to draft the side letter. The next day, it reviewed the side letter and presented it to Red Zone for signature.

In December 2005, Cadwalader advised Red Zone with respect to a second amendment to the engagement agreement, which did not relate to the fee dispute between UBS and Red Zone. No work was done after December 2005 until May 22, 2007, when UBS sent Red Zone a demand letter for the remainder of the $10 million fee.

Shortly after receiving the letter, Red Zone representatives spoke with Mr. Block by phone about the demand letter. Cadwalader billed Red Zone for the consultation. Mr. Block

explained to Red Zone that he could not be counsel of record because of his involvement in negotiating the side letter, but that he would help find trial counsel, and that he would still work with Red Zone on the matter. Mr. Block testified that he does not recall making such statements.

Cadwalader recommended Red Zone retain Gregory Joseph, Esq. to respond to the demand letter, and Red Zone did so. Mr. Joseph responded to UBS on Red Zone's behalf by letter dated June 11, 2007. Prior to responding, Mr. Joseph spoke with Mr. Block about the situation. When Red Zone received a reply from UBS on July 31, 2007 it immediately forwarded the reply letter to Mr. Block. Soon thereafter UBS filed suit against Red Zone.

On August 8, 2007, Red Zone discussed the case with Mr. Block and Mr. Block indicated that he thought UBS's case was without merit. Mr. Block offered to call an employee of UBS he knew from his representation of the man while he was employed at another financial institution to tell UBS to drop their claim against Red Zone. Cadwalader billed Red Zone for the August 8, 2007 consultation. This was the last bill that Cadwalader sent to Red Zone relating to the UBS fee dispute. Red Zone representatives have testified that Cadwalader neither expressed that it was no longer going to bill, nor indicated any reason for why it had stopped billing.

Cadwalader prepared, but did not send, two draft retainer letters for execution by Red Zone. The first was prepared at some point in 2006 and the second in October 2007. The language of the second letter indicates that Cadwalader's representation of Red Zone on matters related to the Six Flags transaction had ended.

Prior to a dinner meeting with UBS in late August 2007, Mr. Snyder consulted with Mr. Block about whether a settlement offer should be made with respect to the fee dispute. Mr. Block advised that Red Zone should not settle unless UBS made a "very low offer." After the dinner meeting, Red Zone's internal counsel, Mr. Donovan, and Mr. Snyder contacted Mr. Block to discuss the dinner meeting.

Mr. Block testified at his deposition in the UBS litigation that he had an attorney-client privileged communication with Mr. Snyder about the UBS litigation shortly after it commenced.

In the spring of 2008, Red Zone obtained names of UBS board members and spoke with Mr. Block about whether he knew any of them. Mr. Block responded that he did not. Prior to sending a letter to the board members, Red Zone provided Mr. Block with

a copy of the letter for comments and advice. Mr. Block provided comments on the letter.

On August 6, 2008, Red Zone and UBS entered mediation. Before mediation, Mr. Snyder consulted with Mr. Block about settlement positions, and Mr. Block told Mr. Snyder that the UBS claim had no merit. Immediately following mediation, Red Zone representatives called Mr. Block to report what had occurred.

In November 2008, Red Zone consulted with Mr. Block regarding a trial stipulation to the effect that Mr. Snyder and other Red Zone employees would guarantee payment of any adverse judgment against Red Zone, in return for UBS withdrawing its motion to amend its complaint to add claims for fraudulent conveyance relating to the distribution of Red Zone common stock.

In December 2008, Mr. Block told Mr. Snyder that there was "plenty of case law" to support Red Zone's position. Mr. Block also spoke with Mr. Donovan, and discussed two recent cases that concerned the issue of "change of control" under Delaware law. Mr. Block suggested that Red Zone's trial counsel should move for "judgment on the pleadings" based on the issue of control.

As the case progressed, trial documents were routinely sent to Cadwalader. Some of these papers were labeled, "Confidential & Attorney Work Product." In the spring of 2009, Mr. Block offered to review Red Zone's summary judgment papers, and he provided comment on these papers.

In June of 2009, Red Zone's trial counsel sent its draft brief on summary judgment to Cadwalader for review. In an email trial counsel wrote, "I am sending pursuant to the privilege our law firms share as council [sic] to Red Zone . . . . Please thank Dennis Block for offering to review the brief in his capacity as counsel to Red Zone." On June 4, 2009, Cadwalader sent trial counsel an email saying: "When you have a revised draft, we'd of course be happy to look at that." Following this, Cadwalader and Red Zone exchanged emails regarding drafting submissions in the case.

When oral arguments went poorly in May 2010, Red Zone consulted with Mr. Block about the case. On June 3, 2010, in a meeting at Cadwalader's offices, Red Zone discussed the UBS litigation with Cadwalader. In December 2010, Red Zone consulted with Cadwalader regarding amicus support of their position.

Mr. Raskopf was the lead partner at the firm serving as Red Zone's trial counsel on the Red Zone-UBS fee dispute. He testified that his firm routinely shared confidential documents with Cadwalader, seeing them as joint counsel. He stated that such documents would not be shared with "mere former counsel."

Mr. Block explained that Cadwalader did not understand there to be an ongoing, continuous, developing and dependent relationship between the firm and Red Zone, at any point after December 2005. He also stated that he had no understanding of the need for further representation of Red Zone by Cadwalader, on the subject matter of the side letter, at any time after it was executed. Mr. Block explained that he viewed his communications with Red Zone as merely "being helpful" rather than providing "advice" or "approving strategies in the capacity of legal counsel." Similarly, Mr. Block explained that when he reviewed documents pertaining to the UBS litigation that he did not understand himself to be doing so in the capacity of legal counsel.

## Discussion

"To establish a cause of action for legal malpractice, the plaintiff must show that the attorneys were negligent, that their negligence was the proximate cause of the plaintiff's damages, and that the plaintiff suffered actual damages as a direct result of the attorneys' actions." (*Franklin v Winard*, 199 AD2d 220, 221 [1st Dept 1993].) Attorneys are said to be negligent if they "fail[ ] to exercise that degree of care, skill and diligence commonly possessed and exercised by a member of the legal community." (*Barbara King Family Trust v Voluto Ventures LLC*, 46 AD3d 423, 424 [1st Dept 2007].)

Red Zone has not offered any expert testimony to establish whether Cadwalader breached a standard of professional care or skill. Absent expert testimony, a finding of malpractice is only appropriate when "the ordinary experience of the fact-finder provides sufficient basis for judging the adequacy of professional service, *or the attorney's conduct falls below any standard of due care."* (*Northrop v Thorsen*, 46 AD3d 780, 782 [2d Dept 2007].)

To obtain summary judgment, the moving party must establish its cause of action "sufficiently to warrant a court's directing judgment in its favor as a matter of law." (*Gilbert Frank Corp. v Federal Ins. Co.*, 70 NY2d 966, 967 [1988].) In order to defeat the motion, the defending party must produce admissible evidence to establish a factual issue requiring trial. (*Id.*) The

motion must be scrutinized in a light most favorable to the opposing party. (*Negri v Stop & Shop*, 65 NY2d 625, 626 [1985].) The Court of Appeals has said, "as a practical matter summary judgment continues to be a rare event in negligence cases. But this does not mean that the court is obliged, on policy grounds, to ferret out speculative issues 'to get the case to the jury' " (*Andre v Pomeroy*, 35 NY2d 361, 364 [1974]).

Negligence

Red Zone alleges that Cadwalader "botched" the one-page side letter. This allegation can be parsed out in steps.

■ First, Red Zone and UBS orally agreed to limit Red Zone's payment obligation at $2 million unless Red Zone owned more than 50% of Six Flags' common stock. There are no material issues of fact in dispute on this point. Mr. Snyder, the managing member of Red Zone, submitted an affidavit swearing that this was the purpose for entering into the side agreement. Mr. Block also testified that this was the purpose for entering into the side agreement.

Second, Red Zone instructed Cadwalader to draft the side letter to memorialize the oral agreement between Red Zone and UBS on this point. There is no material issue of fact on this point. Mr. Snyder testified that he instructed Cadwalader to reduce the oral agreement to writing.

Third, Red Zone alleges that Cadwalader breached the duty of care it owed to Red Zone by failing to limit Red Zone's payment obligation to UBS as orally agreed by Red Zone and UBS. Red Zone claims that any fool could have drafted a letter correctly memorializing the oral agreement.

Cadwalader has several responses.

Cadwalader argues that it warned Red Zone that the side letter might not have limited its payment obligation to $2 million. The only evidence Cadwalader presents to support this claim is an affidavit of Mr. Block. This affidavit starkly contradicts Mr. Block's deposition testimony, given during the UBS litigation.

"A party's affidavit that contradicts her prior sworn testimony creates only a feigned issue of fact, and is insufficient to defeat a properly supported motion for summary judgment." (*Harty v Lenci*, 294 AD2d 296, 298 [1st Dept 2002]; *see also Phillips v Bronx Lebanon Hosp.*, 268 AD2d 318, 320 [1st Dept 2000] ["While issues of fact and credibility may not ordinarily be determined on a motion for summary judgment, where, as here, the self-serving affidavits submitted by plaintiff in opposition clearly contradict plaintiff's own deposition testimony . . . they

are insufficient to raise a triable issue of fact to defeat defendant's motion for summary judgment"].)

Mr. Block's affidavit testimony relating to legal malpractice has not been considered by the court in dealing with its determination of malpractice. Absent this affidavit, Cadwalader has not submitted evidence to create a material issue of fact that it warned Red Zone that the side letter might not have limited Red Zone's payment obligations.

Cadwalader argues that the side letter was not unreasonable. Cadwalader points to statements in Red Zone's briefs in connection with its appeal to the Court of Appeals that the definition of control used by the Appellate Division was a "radical departure" from prior case law. Red Zone's argument about the definition of control was made in an attempt to win an appeal of an adverse decision in its case against UBS, despite the fact that the side letter had been held by the Appellate Division to have failed to limit their payment obligations. If the side letter functioned to limit Red Zone's payment obligations, as the parties orally agreed it was to function, then there never would have been a serious question about the definition of control. At best, Cadwalader's argument could demonstrate that the side letter was close to being unnecessary, but it has no bearing on whether the side letter was a reasonable attempt to memorialize the oral agreement.

Cadwalader also argues that even if the side letter did not expressly cap Red Zone's payment obligations, as a practical matter it may have been reasonable to think that it was sufficient protection, in the circumstances. To support this, Cadwalader points to the fact that at the time the side letter was executed, Red Zone apparently had no intention of obtaining control of Six Flags. Essentially, Cadwalader is claiming that even if there were gaps in the side letter, these gaps were reasonable because they only later came into play as a result of unexpected circumstances.

The reasonableness of a gap in a contract is often a factual issue, but here the gap was unreasonable as a matter of law. Cadwalader has not produced any evidence indicating that Red Zone's increased presence on the Six Flags board was unexpected. The general purpose of the agreement between UBS and Six Flags was to increase Red Zone's influence over Six Flags and, more specifically, this was also the purpose of the consent solicitation which the side letter referenced. Cadwalader was well aware of these ambitions when it reviewed the side letter.

Red Zone's continued acquisition of seats on the Six Flags board was intimately connected to the purpose of the side letter.

Cadwalader argues that the side letter was reasonable because UBS agreed that it limited Red Zone's payment obligations. To support this claim, Cadwalader relies on the affidavits of the UBS representatives who signed the side letter. Their testimony states that they believed that the oral agreement limited Red Zone's payment obligations. Nothing in their testimony suggests that the side letter itself accurately memorialized the oral agreement. Even if the affidavits of the UBS business representatives supported its argument, this would have no bearing on the reasonableness of the side letter. No reasonable attorney would rely upon an opposing party's interpretation of a contract.

Cadwalader's position that the side letter was not unreasonable is without merit.

Causation

To establish a claim to recover for malpractice the plaintiff must show that "but for" the lawyer's negligence she would not have suffered the injury. (*AmBase Corp. v Davis Polk & Wardwell*, 8 NY3d 428, 434 [2007].)

According to Cadwalader, it should not be liable because the UBS litigation did not hinge on the side letter. This argument is not compelling. But for Cadwalader's failure to professionally prepare the side letter, the UBS litigation would have hinged on the side letter.

The court ruled that Red Zone's increased presence on the Six Flags board of directors in the period between August 17, 2005 and May 22, 2007 constituted an acquisition transaction, as such term is defined in the engagement agreement. Because Red Zone never achieved anywhere near a 51% ownership position in Six Flags' common stock, this increased presence would not have constituted an acquisition transaction had the side letter done what it was supposed to do.

The only possible issue is whether the side letter could have modified the engagement agreement. This issue is quickly resolved by noting that the Appellate Division did not treat the side letter as inadmissible parol evidence. Instead, it considered the side letter, treating it as a modification of the engagement agreement, and determined that the side letter failed to limit Red Zone's payment obligations.

Cadwalader argues that it was not the cause of Red Zone's injury because Red Zone had an opportunity to avoid the injury by prevailing in the lawsuit against UBS. A claim for legal mal-

practice fails where "[i]t is clear that the proximate cause of any damages sustained by plaintiff was not the alleged malpractice of defendants, but rather the intervening and superseding failure of plaintiff's successor attorneys." (*Pyne v Block & Assoc.*, 305 AD2d 213, 213 [1st Dept 2003].)

Red Zone's subsequent counsel had little opportunity to limit Red Zone's liability. Although Red Zone's subsequent counsel is experienced and well regarded, the UBS litigation can best be summed up by reference to Harry Hopkins' aside to President Roosevelt at the bleak moment of the economy's crash in 1938, "There are no more rabbits."

Cadwalader complains that Red Zone did not offer expert testimony during the UBS litigation and did not depose some potential witnesses. These strategic decisions are entirely unlike the shortcomings of subsequent counsel that have been found to disrupt original counsel's causal relationship to the client's liability. For example, in *Pyne*, the subsequent attorney failed to serve potentially liable parties in a timely fashion. (*Id.*) Even if this rule could be applied to general strategic miscalculations, there is no reason to hold that Red Zone's subsequent counsel made any mistakes. The court in the UBS litigation did not rely on parol evidence in making its decision. Entering additional testimony could not have altered the outcome.

Statute of Limitations

The side letter was executed and signed on August 17, 2005. When this claim was filed in April of 2011, over five years had elapsed since the alleged malpractice occurred. Legal malpractice claims generally must be filed within three years of the alleged malpractice. (CPLR 214 [6].) However, the statute of limitations is tolled through the duration of an attorney's "continuous representation" of her client. (*See Glamm v Allen*, 57 NY2d 87, 93 [1982].) Unless the statute of limitations was tolled through the doctrine of continuous representation the claim must be dismissed as untimely.

The doctrine of "continuous representation" tolls the statute of limitations "until the completion of the attorney's ongoing representation concerning the matter out of which the malpractice claim arises." (*Pellati v Lite & Lite*, 290 AD2d 544, 545 [2d Dept 2002].) "In those cases where the continuous representation doctrine has been applied to attorney malpractice there are clear indicia of an ongoing, continuous, developing and dependent relationship between the client and the attorney often involving an attempt by the attorney to rectify an alleged act of

malpractice." (*Muller v Sturman*, 79 AD2d 482, 485 [4th Dept 1981].)

"The continuous representation doctrine tolls the statute of limitations only where there is a mutual understanding of the need for further representation on the specific subject matter underlying the malpractice claim." (*McCoy v Feinman*, 99 NY2d 295, 306 [2002].)

On August 17, 2005, when Cadwalader reviewed the side letter, there was a relationship between Red Zone and Cadwalader relating to Red Zone's attempt to gain greater influence over Six Flags and UBS's role in this effort. Red Zone representatives have testified that it was their understanding that Cadwalader would provide any legal service necessary as the initiative continued. This testimony does not, as a matter of law, establish that Red Zone had an understanding of the *need* for further representation on the issue.

Eighteen months later, when Red Zone received a letter from UBS demanding payment for its work on the Six Flags initiative, Red Zone contacted Cadwalader. UBS's demand, and the litigation relating to this demand, would have been meritless but for Cadwalader's failure to properly draft the side letter. It is true as a matter of law that the dispute with UBS was "concerning the matter out of which the malpractice claim arises." (*Pellati* at 545.)

The work performed by Cadwalader following the demand letter constituted representation. Mr. Block provided first comment and advice on the UBS demand letter. He claimed attorney-client privilege during his deposition at the start of the UBS litigation. He provided advice on a letter to pressure the UBS board into dropping the suit. Then he advised Red Zone on settlement strategies prior to mediation. As the case moved to trial, he provided advice on trial stipulations. He gave his opinion on the merits of the case, and pointed to specific case law that related to the case. Trial documents were routinely passed to Cadwalader, labeled "Confidential & Attorney Work Product." During the trial he advised on summary judgment papers. He received files from trial counsel that identified him as counsel to Red Zone, and responded by inviting further files be sent along for comment. When appellate arguments went poorly, Mr. Block discussed the case over the phone with Red Zone representatives. Subsequently, Red Zone representatives met at Cadwalader's offices to discuss the litigation, and Red Zone consulted Cadwalader regarding amicus support.

Cadwalader quotes from *Feld v Willkie, Farr & Gallagher* (2004 NY Slip Op 30334[U], *3 [Sup Ct, NY County 2004]), which says that work as "backup or shadow counsel" does not constitute continuous representation. While the court in that case did identify the attorney as mere "backup or shadow counsel" they did not indicate that this appellation had anything to do with their holding. Instead, the court held that there was not continuous representation because the two sets of representation related to completely different events. (*Id.* at *7.) The court did go on, for the sake of argument, and address whether the attorney's work was sufficient. Even this analysis had nothing to do with the attorney being "shadow counsel."

Cadwalader cites *Tal-Spons Corp. v Nurnberg* (213 AD2d 395, 397 [2d Dept 1995]), which held that consultation between the defendant attorney, plaintiffs "and their new attorneys regarding pending litigation over the meaning of the contract drafted by him cannot be equated with ongoing representation." *Tal-Spons* was not decided on the issue of whether the representation was sufficiently substantial. Rather, the Court held that regardless of how substantial the representation was, the continuous representation doctrine did not apply because there was a "history of litigation" between the attorney and the client that had ruined their relationship of trust and confidence. (*Id.*)

Here, in contrast, there was representation as of August 17, 2005. There was representation following May 22, 2007 and extending through the duration of the UBS litigation. Red Zone thus undoubtedly contemplated the need for further representation upon receiving the UBS demand letter. The initial issue is whether a finding of continuous representation is undermined because of the gap period in which Red Zone did not actively contemplate the need for further representation.

Cadwalader argues that if there is a "clear break" between two periods of representation, then the continuous representation doctrine is undermined. (*See Goldman v Akin, Gump, Strauss, Hauer & Feld, LLP*, 11 Misc 3d 1077[A], 2006 NY Slip Op 50604[U], *2 [Sup Ct, NY County 2006], *affd* 46 AD3d 481 [1st Dept 2007].) It is not clear that the determining break in *Goldman* was a gap in time, or a "break" in which the substance of the work changed. Therefore, *Goldman* is not helpful in resolving this issue. In contrast, an appellate court has found continuous representation in a situation with significant gaps. (*See N&S Supply v Simmons*, 305 AD2d 648 [2d Dept 2003] [finding continuous representation despite a period of about 18

months as to which there was no holding that the client contemplated a need for further representation on the relevant issue].)

In the extreme, the requirement of contemplated further assistance required by *McCoy* could be interpreted to undermine claims of continuous representation the moment a client takes a premature sigh of relief. It is not surprising that *McCoy* did not address the significance of a gap in the client's expectation, because in *McCoy* the attorney never provided representation after the malpractice. (*McCoy* at 300.) The supposed "continuation" in *McCoy* was a matter of mere omission. There, the attorney did not formally close the client's file and the plaintiff had argued that this tolled the statute of limitations. Even if the rule in *McCoy* is strictly followed, the statute of limitations would be tolled once active representation and mutual contemplation of the need for representation resume.

This rule comports well with the purposes of the tolling doctrine. The purpose of the doctrine is to keep a client from having to "jeopardize his pending case or his relationship with the attorney handling that case during the period that the attorney continues to represent the person." (*Glamm v Allen*, 57 NY2d 87, 94 [1982].) While the client could sue without jeopardizing any pending case during the gap, as soon as representation resumes the client's initiation of a malpractice suit would likely jeopardize its case. This rule is particularly reasonable when the "gap" was merely a period absent expectations, rather than a period when representation formally ended. In cases such as this, it is natural for a client to immediately return to the attorney that it had previously worked with, once an issue arising from malpractice is detected.

To summarize, regardless of whether the court follows *N&S Supply v Simmons* by tolling the statute of limitations through the duration of the gap, or follows a rule according to which the statute runs during the period in which there was not an expectation of future controversy, the gap period does not undermine the timeliness of Red Zone's claim.

Cadwalader argues that there are two additional reasons that the continuous representation doctrine should not apply to this case. Neither of these reasons alters a finding of continuous representation.

First, Cadwalader claims that, for the purposes of the continuous representation doctrine, representation ends once the client has consulted a different attorney. This rule is plainly stated in an unpublished opinion in the United States District Court,

Northern District of New York. (*Docster v Levene*, 2005 WL 1388899, \*5, 2005 US Dist LEXIS 48382, \*13-14 [ND NY, June 8, 2005, No. 3:03-CV-1193 (FJS/DEP)] ["(O)nce a client consults with another attorney with respect to the matter in which his initial attorney represented him, continuous representation clearly ends because, at that point, the client is able to question the attorney's actions and to pursue remedies for perceived wrongs"].) It is worth noting that this interpretation of continuous representation was not dispositive in *Docster*. The court ruled that any representation that had continued was for the corporate entity in question, and not for the individual plaintiff. (*Docster*, 2005 WL 1388899, \*6, 2005 US Dist LEXIS 48382, \*15.)

New York state courts have not adopted a similar rule. The state case that *Docster* cites for its authority on this issue articulates a far narrower rule: "[i]n these special circumstances, where the attorney promptly moves to withdraw and the client acknowledges in writing an irreparable deterioration of the attorney-client relationship, we conclude that the relationship necessary to invoke the continuous treatment rule did not persist" (*Aaron v Roemer, Wallens & Mineaux*, 272 AD2d 752, 755 [3d Dept 2000]; *see also Tal-Spons Corp.* at 397 [holding that the dispositive issue was not outside consultation but a "history of litigation" between the attorney and client]; *Piliero v Adler & Stavros*, 282 AD2d 511, 512 [2d Dept 2001] ["the relationship necessary to invoke the continuous representation rule ceased to exist when the plaintiff retained new counsel on November 27, 1995, and requested by letter dated December 15, 1995, that the defendants take no further action on the matter in question"]; *Kanter v Pieri*, 11 AD3d 912, 913-914 [4th Dept 2004] [determining that although the client "retained different appellate counsel, both he and his new appellate counsel understood that defendant would be preparing, filing, and serving the notice of appeal in the underlying action, and that he trusted that defendant would do so"]).

The rule is that consultation with additional counsel is only relevant when there has been a breach in "the client's continuing trust and confidence" (*Aaron* at 755). There is no evidence to suggest that there was a breach of trust and confidence between Cadwalader and Red Zone at any point prior to the filing of this case.

Second, Cadwalader has attempted to draw a sharp line between litigation and transactional work. Cadwalader argues that representation during litigation cannot be deemed as

continuous to representation during transactional work. New York courts have not embraced a rule based on such a sharp division.

The closest a New York court has come to embracing the division Cadwalader is calling for was a decision which held:

> "[W]hile defendants were retained to advise plaintiffs and, if need be, serve as their litigation counsel, in connection with litigation then being threatened by the limited partners, as to the sale itself, defendants were retained only to draw the documents necessary to consummate a deal that had already been negotiated and agreed to. Holding plaintiffs to this position . . . , defendants' representation in the arbitrations, which involved the merits of the litigation that was being threatened by the limited partners at the time plaintiffs retained defendants, was distinct from their representation in 'papering' the sale, which did not involve negotiating the terms of the sale or advising whether or not to proceed with it." (*Goldman* at 481-482.)

The decision focused on whether the two sets of representation were sufficiently similar. The continuity between the mere "papering" of a deal, and arbitration on the merits of that deal, was not sufficient to toll the statute of limitations. The decisive factor was not a fine line between litigation and transactional work.

*Offshore Express, Inc. v Milbank, Tweed, Hadley & McCloy, LLP* (2007 WL 760419, *4, 2007 US Dist LEXIS 17368, *10 [SD NY, Mar. 13, 2007, No. 03 Civ-4260 (PAC)]) holds that, "absent unique circumstances" litigation and transactional work should not be deemed continuous. The Second Circuit, in affirming, said "New York courts have consistently held that an attorney's representation in litigation relating to a corporate transaction is only continuous with his or her representation with respect to that transaction if it was contemplated by the parties." (*Offshore Express, Inc. v Milbank, Tweed, Hadley & McCloy, LLP*, 291 Fed Appx 358, 359 [2d Cir 2008].) The cases cited by the Second Circuit in support of this proposition, in fact, do not support it.

*McCoy* was the first case. (*Id.*) *McCoy* discusses the need for "mutual understanding" but does not cite any heightened requirement based on a distinction between litigation and transactional work. (*See McCoy* at 306.) The second case merely discusses the need for "continuing trust and confidence." (*Deep v Boies*, 53 AD3d 948, 950 [3d Dept 2008].) The third case is *Goldman v Akin, Gump, Strauss, Hauer & Feld, LLP* (11 Misc

3d 1077[A], 2006 NY Slip Op 50604[U] [Sup Ct, NY County 2006]), which did not suggest a rule anything like the one proposed by the Second Circuit.

There are two New York cases which conclusively indicate that there is not a sharp division between litigation and transactional work. Both of these cases were discussed and ultimately misinterpreted by the District Court in *Offshore*.

In the first case, continuous representation was found because the attorney initiated contact on several occasions to "effectuate" his client's separation from a business entity, "and to discuss a strategy to defend the main action." (*N&S Supply* at 650.) The District Court in *Offshore* tried to distinguish *N&S Supply* by focusing on the continued transactional assistance. This reading of the decision in *N&S Supply* does not explain why the court specifically addressed the attorney's work on litigation strategy. (*Id.*)

In the second case, the attorney's alleged malpractice occurred in 1983 and the statute of limitations was tolled until 1990 as the attorney provided legal services related to the matter. (*Kuritzky v Sirlin & Sirlin*, 231 AD2d 607, 608 [2d Dept 1996].) The important portion of the case was that

> "[t]he malpractice claim accrued in 1983 when the defendant committed errors in drafting a lease extension agreement between the plaintiffs, as landlord, and their commercial tenant . . . [T]he applicable limitations period . . . was tolled between the accrual of the claim and the discovery of the malpractice in 1990, since the defendant continuously represented the plaintiffs during that period by performing legal services related to the matter out of which the malpractice claim arose . . . Once the drafting errors were discovered in 1990, the defendant engaged in litigation on behalf of the plaintiffs to correct the errors. The litigation ultimately proved unsuccessful in 1993. Accordingly, the plaintiffs' commencement of the malpractice action later that year was timely, inasmuch as there was a relationship of 'continuing trust and confidence' between the parties during which the defendant performed related services in connection with the matter, eventually including 'an attempt . . . to rectify [the] alleged act of malpractice.'" (*Id.* at 607-608 [citations omitted].)

The District Court in *Offshore* stated that the Second Department in *Kuritzky* "did not toll the statute of limitations for the

period of the ensuing litigation, suggesting that litigation services did not involve the same legal matter as the lease agreement itself." (*Offshore*, 2007 WL 760419, *3, 2007 US Dist LEXIS 17368, *9-10 [emphasis omitted].) The District Court in *Offshore* explicitly stated that the statute of limitations was tolled from 1983 to 1990 because of their "continued [legal] services." (2007 WL 760419, *3, 2007 US Dist LEXIS 17368, *9.) It then goes on to state that from 1990 to 1993 the attorney engaged in litigation to correct the errors. When the state court finds the suit is timely it explicitly refer to "services" in connection with the matter and "an attempt . . . to rectify" (*Kurktzky*, 231 AD2d at 608 [internal quotation marks omitted]) which can only reasonably be read to refer to the litigation to "correct the error[ ]." (*Id.*) It is certainly true that the *Offshore* court was more clear that the statute of limitations was tolled from 1983 to 1990. In the absence of any indication that it was not tolled from 1990 to 1993, and in light of the court's explicit reference to both "services" and "an attempt to rectify" the only plausible interpretation is that the tolling continued through 1993. Finally, the statute of limitations for noncontract malpractice cases was three years at the time of the case, and had the court not continued tolling through the litigation, it could not have found the action timely.

Discovery

Cadwalader has repeatedly called for more discovery, arguing that issuing summary judgment at this point would be premature. The court has discretion to deny summary judgment if it "appear[s] from affidavits submitted in opposition to the motion that facts essential to justify opposition may exist but cannot then be stated." (CPLR 3212 [f].)

The affidavits submitted in opposition to the motion for summary judgment do not suggest that there are essential facts that have yet to be discovered. Generic requests for more discovery do not disrupt an otherwise valid summary judgment motion. The specific requests that Cadwalader has made do not suggest that more discovery is needed.

The issue of malpractice is entirely resolved by the documents and testimony presented. While Cadwalader has requested more discovery relating to Red Zone's litigation strategy in the UBS case, there is no reason to believe that probing the issue of Red Zone's strategy could produce a material issue of fact. As discussed above, the UBS case was decided after a careful examination of the relevant written documents, strat-

egizing cannot change the meaning of written words. Even if further strategy could have mattered, Cadwalader has not given the court any reason to believe Red Zone made any mistakes. Finally, genuine strategic mistakes by subsequent counsel are not the sort of intervening event which would undermine a finding that Cadwalader was the proximate cause of Red Zone's injuries.

Cadwalader has also complained that it has not been given the opportunity to depose Mr. Snyder and certain UBS representatives. Again, Cadwalader has made no suggestion as to what these depositions might reveal. UBS representatives have already testified in the UBS litigation regarding their understanding of the side agreement. The UBS representatives would have no knowledge relating to whether or not Cadwalader continued to represent Red Zone. The request to depose Mr. Snyder could only be relevant insofar as it could indicate something about the issue of continued representation. Mr. Snyder has already testified that he understood Cadwalader to be Red Zone's counsel. There is no reason to think he would contradict this statement upon deposition. Any fact that Red Zone might have hoped to question through deposition would have been within the knowledge of Cadwalader representatives as well. In all material ways the testimony of Cadwalader's representatives were consistent with Mr. Snyder's testimony; there is nothing in further need of discovery.

## Conclusion

The court grants Red Zone summary judgment on its claim of legal malpractice. The court finds that the claim is timely and therefore denies Cadwalader summary judgment on its statute of limitation argument.

Accordingly, it is ordered that summary judgment for plaintiff is granted on legal malpractice; and it is further ordered that defendant's motion for summary judgment is denied.