[990 NYS2d 174]

In the Matter of NEW YORK CITY ASBESTOS LITIGATION.

RUBY E. KONSTANTIN, Individually and as Executrix of DAVE JOHN KONSTANTIN, Deceased, Respondent, v 630 THIRD AVENUE ASSOCIATES et al., Defendants, and TISHMAN LIQUIDATING CORPORATION, Appellant.

DORIS KAY DUMMITT, Individually and as Executrix of RONALD DUMMITT, Deceased, Respondent, v A.W. CHESTERTON et al., Defendants, and CRANE CO., Appellant.

First Department, July 3, 2014

234

---

### APPEARANCES OF COUNSEL

*Pillsbury Winthrop Shaw Pittman LLP*, New York City (*E. Leo Milonas, David G. Keyko* and *Anne C. Lefever* of counsel), and *Patton Boggs LLP*, New York City (*John M. Nonna, Larry P. Schiffer* and *Kate S. Woodall* of counsel), for Tishman Liquidating Corporation, appellant.

*K&L Gates LLP*, New York City (*Michael J. Ross*, of the Pennsylvania bar, admitted pro hac vice, *Eric R.I. Cottle* and *Angela DiGiglio* of counsel), for Crane Co., appellant.

*Belluck & Fox, LLP*, New York City (*Seth A. Dymond* of counsel), for respondents.

### OPINION OF THE COURT

Mazzarelli, J.P.

From 1973 to 1977, plaintiff Ruby Konstantin's decedent, Dave John Konstantin (Konstantin) worked as a carpenter at two Manhattan construction sites where defendant Tishman Liquidating Corporation (TLC) was the general contractor. During that time he worked on a regular basis in close proximity to drywall contractors who sanded joint compound, and he was exposed to the dust from the sanding. The pre-mixed compound was manufactured by the Georgia Pacific, Kaiser Gypsum, and U.S. Gypsum companies, and contained asbestos. TLC supervised and controlled the work conducted at the building sites where Konstantin was employed, but took no steps to protect the workers from the hazards of exposure to asbestos dust. It admits that it became aware of those hazards approximately at

the time that Konstantin was working at the sites. Indeed, it appears that TLC knew that asbestos was dangerous as early as 1969. Before working as a carpenter, Konstantin worked at a gas station, from the late 1960s to the early 1970s. As part of his job duties, he performed hundreds of brake jobs, sanding down brake pads made by the Bendix Corporation.

In January 2010, Konstantin was diagnosed with mesothelioma of the tunica vaginalis, an asbestos-related cancer of the tissue lining the testicles. He endured five surgeries, including the removal of one testicle and his scrotum; two rounds of chemotherapy; and one round of "broad-ranged" radiation. By the summer of 2010, the mesothelioma had spread to his pleura, the membrane that lines the lungs. Konstantin began to develop chest-related symptoms, and endured a simultaneous course of pain-reducing and other necessary treatment directed to the groin and chest. He suffered nearly three years of, in his words, "extreme pain and swelling," which he characterized as often "unbearable" and a "10 out of 10" on the pain scale. Konstantin died on June 6, 2012.

From 1960 to 1988, plaintiff Doris Kay Dummitt's decedent, Ronald Dummitt (Dummitt), was an enlisted man in the United States Navy. From 1960 to 1977, Dummitt served on seven naval vessels as a boiler technician. The typical naval destroyer had two boiler rooms, each containing approximately 600 valves. The valves restricted or admitted the flow of steam or other fluid into the equipment. They contained gaskets, which were ring-like components used to seal, among other things, the internal valve bonnet. Packing was also used with the valves; the packing was a rope-like material used to seal the valve stem. Lagging pads were wrapped on the valves for insulation. These components were routinely replaced as a result of the extremely hot environment around the valves.

The majority of the valves used on the ships Dummitt worked on were manufactured by defendant Crane Co. For each type of valve, Crane provided a detailed drawing identifying the specific components and the exact system in which the valve was to be used. The purpose of furnishing the diagram was to create "standardization," so the Navy would know exactly which replacement components to use with each valve. Crane also created Navy-specific symbol numbers, so that, for example, the correct components for a specific valve and system could be determined by reference to a component table.

While not every Crane valve used components such as gaskets, packing, and lagging pads made of asbestos, those that did were

typically identified in the drawings. For these valves, Crane supplied the Navy with original asbestos gaskets and packing, made by other manufacturers, that was later branded as "Cranite," Crane's in-house asbestos component brand. The standard asbestos components were assigned the symbol "1108." The asbestos components were typically 85% asbestos and 15% rubber binder. Over time, Crane successfully lobbied the Navy to replace components made by other manufacturers with Cranite. In addition to the gaskets and packing, the lagging pads were also asbestos. The lagging pads were meant to provide insulation for the valves, a requirement for all equipment that would run higher than a temperature of 125 degrees. The Navy required Crane to test these pads prior to Naval use. Indeed, Crane helped write the Navy's machine manual, "Naval Machinery," in 1946, which specifically directed the use of asbestos for insulation.

Dummitt testified that his exposure to asbestos came from having to maintain the valves. He admitted, however, that it was not the initial use of the valves and components that caused the release of asbestos dust, since the ships he served were too old for him to have been exposed to the original components. Rather, it was the process of replacing the components that caused the exposure. When a component needed to be replaced, the deteriorated gaskets would need to be scraped or wire-brushed off the valve. Packing would be pulled off with a hook and blasted with compressed air. In addition, before maintenance of the valves could be performed, the lagging pads needed to be removed, which also created dust. Indeed, Dummitt stated that it was almost impossible not to be exposed to asbestos dust when removing the pads. Dummitt conceded that he was never exposed to asbestos from products that were either supplied or sold by Crane.

Dummitt was diagnosed with pleural mesothelioma in April 2010. He endured four "very painful" thoracentesis procedures to relieve the "crushing" pressure in his lungs, thoracic surgery, a complete lung collapse, and three rounds of chemotherapy.

Konstantin, and his wife derivatively, commenced this action against TLC, among others, alleging that TLC was liable under Labor Law § 200 for negligently supervising and controlling the work of the drywall subcontractors, and was directly liable in common-law negligence for its own workers' power-sweeping activities, which created additional and greater asbestos dust exposure. Dummitt, and his wife derivatively, who were repre-

sented by the same lawyers as Konstantin and his wife, commenced a separate action against Crane, among others, alleging that Crane acted negligently in failing to warn Dummitt of the hazards of asbestos exposure for the components used with its valves, and that such negligence was a proximate cause of his injuries.

The two actions were grouped with a cluster of 10 cases and assigned to an *in extremis* calendar. Three of the plaintiffs suffered from lung cancer and seven from mesothelioma. Upon motion by all of the plaintiffs, the seven mesothelioma cases, including Konstantin's and Dummitt's, were set for a joint trial. In consolidating the cases, the trial court rejected defendants' contention that specific commonality of work sites and occupations was necessary for consolidation, finding that a strict construction of that requirement would not conserve judicial resources or reduce litigation expenses. The court noted that in the mesothelioma cluster, five of the plaintiffs were in the construction trade, and two worked on ships and alleged exposure from pumps and valves and their component parts. The court determined that the medical evidence would overlap, the "state-of-the-art" evidence would overlap, and there were sufficient commonalities among the types of work and manner of exposure to warrant consolidation.

Before the trial began, five of the mesothelioma cases settled, leaving only Konstantin's and Dummitt's to be tried. They were tried between July 5, 2011 and August 17, 2011. Only Konstantin testified live at trial; Dummitt was not well enough to come to court, and the jury viewed excerpts from his videotaped deposition. TLC was found 76% liable for Konstantin's injuries, and each of the three joint compound manufacturers 8% liable. The jury awarded Konstantin damages of $7 million for past pain and suffering, $12 million for future pain and suffering, $64,832 for past lost earnings, and $485,325 for future lost earnings, for a total of more than $19 million in damages. They also found that TLC was reckless.

Crane was held 99% liable for Dummitt's injuries, and Elliott, another defendant, 1% liable, for their negligence in failing to warn Dummitt about the dangers of asbestos. The jury determined that such negligence was a proximate cause of Dummitt's injuries and that Crane was reckless. Dummitt was awarded a total of $32 million, including $16 million for pain and suffering.

TLC moved to set aside the *Konstantin* verdict, arguing, inter alia, that the trials should not have been consolidated, that the

jury's allocation of fault was improper, that the evidence did not support a finding that TLC was reckless, and that the damage awards deviated from reasonable compensation and should be remitted. The court granted TLC's motion to the extent of setting aside the damages verdict and ordering a new trial on the issue of damages, unless Konstantin stipulated to reduce the awards to $4.5 million for past pain and suffering and $3.5 million for future pain and suffering. The award broke down to about $157,000 per month based on Konstantin's 33 months of past pain and suffering and (likely) 18 months of future pain and suffering. Konstantin accepted the remittitur of the award, and judgment was entered.

Crane sought to set aside the *Dummitt* verdict, arguing, inter alia, that it was not liable for the placement of products it did not manufacture into the stream of commerce. Crane contended that since the asbestos-containing components were manufactured by unrelated third parties, it could not be held liable for a failure to warn Dummitt concerning the dangers of asbestos in those products. Like TLC, Crane argued that the jury's finding of recklessness should be set aside, that the allocation of fault was improper, and that the damages should be remitted.

The court granted Crane's motion only to the extent of reducing Dummitt's damages to $5.5 million for past pain and suffering and $2.5 million for future pain and suffering. In so doing, the court rejected Crane's theory that it could not be liable because it did not place the asbestos-containing components into the stream of commerce. The court found that Crane was liable because it knew or should have known that the components, which were meant to be used in conjunction with its product, contained asbestos and were therefore likely hazardous. The court noted that, despite Dummitt's argument to the contrary, Crane's liability was not based solely on whether it was foreseeable to Crane that asbestos-containing components would be used with its products, but rather on "circumstances which strengthen the connection between Crane's valves and the defective gaskets, packing, and insulation."

Dummitt stipulated to the reduction in damages, and judgment was entered in the amount of $4,438,318.87 in his favor, after accounting for certain setoffs to which Crane was entitled.

TLC (but not Crane) argues that the two actions should not have been consolidated because they involved different factual and legal issues. It asserts that the difference between the work environments of Navy ships and construction sites is vast, as is

the nature of work plaintiffs' decedents were engaged in during their exposures. TLC also focuses on the different types of products to which the two men were exposed, one having worked with asbestos in the components used in valves and pumps on ships, and the other having been near dust from joint compounds. TLC also asserts that Konstantin and Dummitt were exposed to asbestos for different lengths of time, with Dummitt being exposed on many different ships between 1960 and 1976 and Konstantin exposed from 1974 to 1977, a fraction of Dummitt's time.

TLC further contends that consolidation was improper because plaintiffs' decedents suffered from different mesothelioma subtypes, with Dummitt having pleural mesothelioma and Konstantin experiencing it in the lining of the testicles. The decedents also were at different stages of their illnesses, Dummitt being so gravely ill he could not testify live, whereas Konstantin was well enough to appear before the jury. TLC alleges that because Dummitt was so much more gravely ill than Konstantin, there was a danger of the jury conflating the two in their minds.

TLC also argues that plaintiffs' decedents were pursuing different legal theories, since Dummitt was advancing a product liability/failure to warn claim, and Konstantin was asserting a negligence claim and a violation of Labor Law § 200. TLC contends that trying these two cases together required the jury to grapple with different elements of liability and to sort through voluminous evidence, much of which was relevant only to one case or the other.

TLC also asserts that the decision to consolidate directly led to a confusing and disjointed trial, with different witnesses in the different cases focusing on different theories of recovery, sometimes following each other on the same day. For example, Dr. Jacqueline Moline, one of Konstantin's experts, began testifying on July 11, 2011. She was followed by Dummitt's video deposition, and then Konstantin's direct examination. Konstantin's testimony was then interrupted for testimony from Dummitt's oncologist, which was followed by another portion of Dummitt's video deposition focusing on his pain and suffering. Konstantin then resumed his direct testimony on July 15. Later in the trial, on July 26, 2011, Konstantin read to the jury the deposition testimony of Charles DeBenedittis, an executive of Tishman Speyer, from an unrelated case. This was followed by testimony concerning only Dummitt's case. More than a week later, testimony concerning Konstantin resumed.

Defendants put on a case that was similarly disjointed. First, on August 2 and 3, testimony revolved around Dummitt's case, followed by Dr. Michael Siroky, a Konstantin-only witness, whose testimony was interrupted by testimony from two more Dummitt witnesses. Siroky, due to scheduling issues, never retook the stand, and completing his testimony by videotape. TLC emphasizes the fact that the court repeatedly acknowledged and apologized for these scheduling issues. It further states that the jury was given confusing and misleading information on causation. For example, it points to the fact that Dr. Moline, Konstantin's expert, testified concerning whether sweeping could create asbestos fiber dust, which was directly related to causation in Konstantin's case. However, plaintiffs' counsel told the jury that Moline was testifying in Dummitt's, and not Konstantin's, case.

On the issue of damages, TLC contends that the testimony was also confusing. As an illustration, it points to the fact that plaintiffs' counsel told the jury that Dr. Moline was testifying solely as to Dummitt's claim, and not as to the specifics in the *Konstantin* case, but then Dr. Moline gave general testimony concerning the pain associated with mesothelioma without distinguishing between the two men.

 Initially, the issue of consolidation is properly before us and we reject the *Konstantin* plaintiff's contention that by not taking an interlocutory appeal from the consolidation order, TLC waived its right to our review. The judgment on appeal brings up the consolidation order (*see* CPLR 5501 [a] [1]). In this circumstance, TLC had no obligation to appeal that order separately after it was issued. Nor was a renewed objection to consolidation necessary after the court whittled down the cases to his and Dummitt's only. Further, the *Konstantin* plaintiff's argument that we should not review the issue based on her claim that the record is incomplete is not persuasive. The *Konstantin* plaintiff should have moved to dismiss the appeal or to supplement the record. She did neither. In any event, we deem the record to be sufficient. The question is whether "[m]eaningful appellate review . . . has . . . been rendered *impossible*" (*UBS Sec. LLC v Red Zone LLC*, 77 AD3d 575, 579 [1st Dept 2010], *lv denied* 17 NY3d 706 [2011] [emphasis added]). This record provides adequate facts to meaningfully determine whether consolidation was properly granted.

Consolidation of cases is authorized by CPLR 602 (a), which provides:

> "When actions involving a common question of law or fact are pending before a court, the court, upon motion, may order a joint trial of any or all the matters in issue, may order the actions consolidated, and may make such other orders concerning proceedings therein as may tend to avoid unnecessary costs or delay."

As the statutory language suggests, joining cases together is designed to "reduce the cost of litigation, make more economical use of the trial court's time, and speed the disposition of cases" (*Matter of New York City Asbestos Litig. [Brooklyn Nav. Shipyard Cases]*, 188 AD2d 214, 225 [1st Dept 1993], *affd* 82 NY2d 821 [1993]). Further, "great deference is to be accorded to the motion court's discretion" in joining cases together (*Matter of Progressive Ins. Co. [Vasquez—Countrywide Ins. Co.]*, 10 AD3d 518, 519 [1st Dept 2004]).

*Malcolm v National Gypsum Co.* (995 F2d 346 [2d Cir 1993]) is the seminal case concerning consolidation in asbestos cases. There, the Second Circuit endorsed

> "[a standard set of] criteria . . . as a guideline in determining whether to consolidate asbestos exposure cases[,] includ[ing]: (1) common worksite; (2) similar occupation; (3) similar time of exposure; (4) type of disease; (5) whether plaintiffs were living or deceased; (6) status of discovery in each case; (7) whether all plaintiffs were represented by the same counsel; and (8) type of cancer alleged" (995 F2d at 350-351 [internal quotation marks and citations omitted]).

The court entertaining a consolidation motion is further required to take into consideration the number of separate cases (*id.* at 352). This Court has applied the *Malcolm* factors to asbestos cases (*see Matter of New York City Asbestos Litig.*, 99 AD3d 410, 411 [1st Dept 2012]). Not all of the factors need be present; consolidation is appropriate so long as "individual issues do not predominate over the common questions of law and fact" (*id.*). However, in asbestos cases, it has been "routine" to join cases together for a single trial (*see e.g. Bischofsberger v A.O. Smith Water Prods.*, 2012 NY Slip Op 32414[U], *2-3 [Sup Ct, NY County 2012]).

TLC's argument primarily concerns the first five *Malcolm* factors. Regarding the first two, some trial courts have rejected

a narrow focus on the specific locations of the exposures and types of work in favor of an analysis that considers whether two or more plaintiffs were "engaged in an occupation related to maintenance, inspection and/or repair and [were] 'exposed to asbestos in the "traditional" way, that is, by working directly with the material for years' " (*see e.g. Matter of New York City Asbestos Litig.*, 2010 NY Slip Op 33941[U], *6 [Sup Ct, NY County 2010] [joining cases of residential drywaller, Navy pipefitter, home renovator, plant electrician, powerhouse worker, and Navy electrician for trial, where their injuries "resulted from 'insulation exposure from boilers, valves, pumps, and other insulated equipment' "]). Other courts have focused on the types of asbestos product to which the plaintiffs were exposed, and whether they were manufactured and distributed by different defendants (*see e.g. Bischofsberger*, 2012 NY Slip Op 32414[U]).

With respect to the third factor, whether two or more asbestos plaintiffs' times of exposure were common, the focus is on evidence of the state of the art at the time (*see Malcolm*, 995 F2d at 351). In *Malcolm*, there was no commonality where exposures among the plaintiffs began in the 1940s and ended in the 1970s, and some plaintiffs were exposed throughout that period but others were exposed for much shorter periods within it. In considering the fourth factor, type of disease, trial courts have ruled inconsistently where different plaintiffs who propose joint trials have different types of mesothelioma (*compare Matter of New York City Asbestos Litig.*, 2012 NY Slip Op 32097[U], *20-21 [Sup Ct, NY County 2012] [finding that peritoneal mesothelioma is a "distinct disease from . . . pleural mesothelioma"], *with Bischofsberger*, 2012 NY Slip Op 32414 [U], *6 [pleural mesothelioma and peritoneal mesothelioma "are the same disease, albeit they present in different parts of the body"]). In determining the fifth *Malcolm* factor, the effect of different plaintiffs' "statuses" (i.e., living or dead), trial courts have looked to whether the defendants would be prejudiced by the presence of deceased plaintiffs in the case (*compare Matter of New York City Asbestos Litig.*, 22 Misc 3d 1109[A], 2009 NY Slip Op 57002[U], *3 [Sup Ct, NY County 2009] [declining to join cases involving deceased plaintiffs with living plaintiffs who were not at risk of imminent death], *with Matter of New York City Asbestos Litig.*, 11 Misc 3d 1063[A], 2006 NY Slip Op 50375[U], *3 [Sup Ct, NY County 2006] [observing that there

was no prejudice in joining deceased plaintiffs with terminally ill plaintiffs]).[1]

■ Giving deference to the trial court, as we must, and considering that the *Malcolm* factors are to be applied flexibly, we find that the trial court properly consolidated the cases. We recognize that a shipboard boiler room is a different physical environment than a building under construction, and that the work performed by the two plaintiffs' decedents was somewhat different. Fundamentally, however, Konstantin and Dummitt were both exposed to asbestos in a similar manner, which was by being in the immediate presence of dust that was released at the same time as they were performing their work. TLC has failed to articulate why the differences in the environments and job duties had such an impact on the manner of exposure that it was necessary for the evidence of exposure to be heard separately. Further, while again not purely overlapping, the exposure periods are sufficiently common. Significantly, both plaintiffs' decedents exposure periods ended in 1977, meaning that the state of the art was the same for both cases. We disagree with TLC that the difference in the types of mesothelioma the plaintiffs' decedents had compels separate trials. TLC can point to no medical evidence in the record suggesting why the differences between the pleural and peritoneal types of mesothelioma are sufficiently significant that to have both types of the disease present in the same case thwarts the purpose of consolidation.

Further, that Dummitt was too ill to appear in court does not confer upon him a different "status" from Konstantin for purposes of whether consolidation was proper. There is no evidence that the jury was aware that his physical condition was dire at the time of trial, so that it would have conflated his condition with that of the less ill Konstantin.

■ In addition to the factors discussed above, TLC argues that consolidation was unwarranted because each plaintiff asserted a different theory of liability. It is true that the *Konstantin* plaintiff asserted a claim for a violation of Labor Law § 200 and common-law negligence, and that the *Dummitt* complaint asserted a claim under the traditional products liability theory of failure to warn. While Konstantin needed to establish TLC's

---

1. There is no dispute that the sixth and seventh *Malcolm* factors, state of discovery and identity of attorneys, are satisfied here. TLC makes no separate argument concerning the eighth factor, which involves the type of cancer alleged.

control of the worksite, and Dummitt was required to demonstrate that the defendants in his case breached a duty to warn, both theories ultimately required a showing that defendants failed to act reasonably in permitting the men to become exposed to asbestos. This common element predominates over any tangential elements inherent in the different theories.

Because the claims presented by plaintiffs had more facts and issues in common than unique to each, we find that the goals of consolidation were met here. TLC, claiming that it was prejudiced, still argues that plaintiffs' motion should have been denied. To successfully oppose consolidation, a party must demonstrate prejudice to "a substantial right" (*Chinatown Apts. v New York City Tr. Auth.*, 100 AD2d 824, 825 [1st Dept 1984]). The allegations of prejudice must be specific and non-conclusory (*see Champagne v Consolidated R. R. Corp.*, 94 AD2d 738 [2d Dept 1983]).

■ TLC's argument that it was prejudiced is based primarily on the disjointed nature of the trial. However, its position that this was solely a result of the joinder of the two claims is inaccurate. The reason witnesses were presented out of order, in most instances, was to accommodate the trial court's hours of operations, which prohibited it from continuing testimony past a certain time, due to budgetary constraints. Indeed, the court expressly stated that this was the case multiple times during the trial, and apologized to the jury for the inconvenience. Compounding the problem was one juror who repeatedly arrived late for the proceedings, ultimately necessitating his removal from the panel in the middle of the trial.

The additional argument made by TLC that the jury was confused by the nature of the trial is speculative, especially in light of the steps the court took to minimize any unfairness. The court carefully and appropriately provided nearly continuous limiting, explanatory and curative instructions, and regularly reminded the jury that a particular line of testimony applied to one plaintiff or the other (*see Cason v Deutsche Bank Group*, 106 AD3d 533 [1st Dept 2013]). The court also implemented other management devices to alleviate and limit any potential juror confusion, such as providing the jurors with notebooks for taking notes, to assist them in recording and distinguishing the evidence in each case. The jurors were also provided with plaintiff-specific interrogatories and jury sheets.

Ultimately, the verdicts support the conclusion that consolidation was proper. The jury demonstrated its understanding of

the different nuances in the two cases. It imposed 76% liability on TLC and 8% liability on each of the manufacturers in that case, while assessing Crane 99% liability in the other. This reflects that the jury was able to distinguish between the evidence presented in each case, recognizing the culpability of the joint compound manufacturers in the *Konstantin* case and the negligible culpability on the part of the valve component manufacturers in the *Dummitt* case. Further, the jury awarded substantially different pain and suffering awards, and assessed a different life expectancy for each plaintiff. Had the jury been confused, as TLC asserts it must have been, it could not have rendered an individualized verdict for each plaintiff consistent with the specific evidence presented with reference to that plaintiff. For these reasons, we find that TLC was not unduly prejudiced by the consolidation of the two cases.

Finally, we decline to adopt TLC's argument, improperly made for the first time in its reply brief, that consolidation of asbestos cases is no longer a compelling policy because the "crisis" that arose when a crushing number of workers became sick as a result of their exposure to the substance has diminished. This policy question is not within our purview to decide, nor is it relevant. The CPLR provides for consolidation where appropriate, without reference to whether the matter concerns asbestos or some other issue.

We now turn to the substantive challenges to the verdicts. TLC maintains that the jury's apportionment to it of 76% liability was against the weight of the evidence. It contends that there was no evidence that it manufactured, bought, sold, distributed, or used the joint compounds that Konstantin was exposed to, or even caused them to be present on the work site. It further claims that it was error for the court to refuse TLC's request that the jury's verdict sheet ask if brake pad manufacturer Bendix Corporation, whom Konstantin had specifically identified, exposed him to asbestos, and whether it was a substantial factor in causing his illness.

A verdict can only be set aside as against the weight of the evidence where it could not have been reached based on any fair interpretation of the evidence (*Berry v Metropolitan Transp. Auth.*, 256 AD2d 271 [1st Dept 1998]). Further, the burden of establishing the equitable share of nonparties' liability falls on the party seeking to reduce its own culpability (*see Matter of New York Asbestos Litig.*, 28 AD3d 255 [1st Dept 2006]). Here, the verdict accurately apportioned liability because TLC did not

adduce any evidence demonstrating the joint compound manufacturers' responsibility. Moreover, Konstantin presented evidence of direct liability against TLC, and supported his theory that TLC violated its duty to responsibly supervise and control the asbestos joint compound work and to protect workers such as himself from exposure. Indeed, since Konstantin was a bystander who was not himself using the product, he would not have seen any warnings that the manufacturers may have attached to it, putting TLC in the best and only position to protect him. In addition, Konstantin adduced evidence sufficient for the jury to infer that TLC knew that asbestos compound was being used on its job sites and that asbestos compound was known to be injurious. Insofar as TLC argues that Bendix should have been included on the verdict sheet, it is submitted that that corporation was properly excluded, since no evidence was adduced at trial showing that the brakes Konstantin worked with contained asbestos.

Crane also argues that the jury's apportionment of liability was against the weight of the evidence. It maintains that the evidence at trial showed that Dummitt was exposed to numerous asbestos-containing products during his Navy service and that there was no evidence that Crane made or supplied those materials. Crane contends that as a consequence, there is no logical basis for it to be held 99% liable for Dummitt's injuries. Indeed, Crane asserts that the evidence showed that Dummitt was exposed to asbestos-containing materials associated with at least 32 different entities, and that none of those entities warned him of the dangers of exposure to asbestos.

 The verdict withstands Crane's challenge because, like TLC, Crane adduced no evidence that any of the other parties were negligent in failing to warn Dummitt. Instead, Crane relies on plaintiffs' state-of-the-art witness, who testified generally to what was historically available in the public domain about the dangers of asbestos, without opining as to whether any party or nonparty knew of the dangers of asbestos. By contrast, Dummitt offered evidence concerning both Crane's general and its specific knowledge of the dangers of asbestos. Moreover, the allocation of 99% liability to Crane was supported by the evidence. As discussed below, Crane was the main source of Dummitt's exposure, through its efforts to market asbestos as the preferred insulation of choice for its valves.

 It was also rational for the jury to conclude that TLC and Crane acted recklessly. Konstantin adduced evidence that as

early as 1969, five years before he began working at any TLC work site, James Endler, a TLC corporate officer and the head of construction, issued a letter admitting that asbestos fibers "had been proved to be injurious to the health of those people exposed to them over prolonged periods of time." Accordingly, he directed that any asbestos dust should be "cleaned up immediately so that men working on the floor would not track the material elsewhere and inject additional fallout material into the air." In 1973, TLC issued a press release for the Olympic Towers construction site, one of the sites where Konstantin worked, advertising its development of a "non-asbestos fire spray" to help protect construction workers from potential health hazards. One can only conclude, then, that TLC had actual knowledge of the dangers of asbestos.

That these admissions did not specifically relate to asbestos-containing joint compound is of no moment. TLC admitted that it knew asbestos joint compound was used on its work sites in the 1970s, and Konstantin adduced evidence that TLC worked with U.S. Gypsum, a joint compound manufacturer, to develop an asbestos-based product. Accordingly, it was rational for the jury to conclude that it should have been at least "obvious" to TLC that by permitting the use of joint compound it was "highly probable that harm would follow" (*Matter of New York City Asbestos Litig.*, 89 NY2d 955, 956 [1997] [internal quotation marks omitted]).

There was also sufficient evidence showing Crane's reckless disregard for the hazards posed by asbestos.[2] The evidence demonstrated that Crane had received warnings about the dangers of asbestos as early as the 1930s from various trade associations, and Crane admitted it knew of the dangers of asbestos by the early 1970s.

Crane makes the separate argument that as a manufacturer of valves, it had no legal duty pertaining to any asbestos-containing valve components manufactured and sold by others. It claims that, by charging the jury that it should find against Crane if it was merely "foreseeable" that the Navy would later replace components made with asbestos, the court ignored well settled precedent that manufacturers can only be held liable for defective products they place in the stream of commerce. Ac-

---

**2.** We reject Crane's contention that Dummitt did not plead recklessness. While Dummitt's complaint did not use the word "recklessness," the allegations unquestionably support the claim.

cording to Crane, the touchstone for this proposition is *Rastelli v Goodyear Tire & Rubber Co.* (79 NY2d 289 [1992]).

In *Rastelli*, the Court of Appeals declined to impose liability on defendant, a tire manufacturer, when a rim that Goodyear did not manufacture and that was attached by a third party after the tire entered the stream of commerce exploded. The Court stated that "[u]nder the circumstances of this case," a manufacturer had no duty to warn "about another manufacturer's product when the first manufacturer produces a sound product which is compatible for use with a defective product of the other manufacturer" (79 NY2d at 297-298). The Court noted that Goodyear had "no control over the production of the subject multipiece rim, had no role in placing that rim in the stream of commerce, and derived no benefit from its sale" (*id.* at 298). The Court further noted that Goodyear's tire "did not create the alleged defect in the rim that caused the rim to explode" (*id.*).

Crane contends that *Rastelli* was extended to the asbestos context in *Matter of Eighth Jud. Dist. Asbestos Litig.* (92 AD3d 1259 [4th Dept 2012], *lv denied* 19 NY3d 803 [2012] [hereinafter *Drabczyk*]). There, the Court, relying on *Rastelli*, held that it was error for the trial court to charge the jury that a valve manufacturer could be held liable where components manufactured by a different company contained asbestos insulation. Although that decision reports very few facts, the *Dummitt* plaintiff supplemented the record with excerpts from the manufacturer's appellate brief, in which it stated that its valves did not need insulation at all. Crane also cites *Surre v Foster Wheeler LLC* (831 F Supp 2d 797 [SD NY 2011]). There, Crane was awarded summary judgment dismissing the plaintiff's failure to warn claim. The plaintiff had worked on Navy ships, but had no knowledge whether Crane manufactured any of the equipment he used. He also worked as a boiler insulator in apartment buildings, and serviced "Pacific" boilers, which Crane was in the business of selling. However, although Crane generally promoted the use of asbestos insulation with its boilers, the plaintiff had no evidence that Pacific boilers required asbestos or that it was "specified for the exterior of any Pacific boiler" (831 F Supp 2d at 802). The court held that "[u]nder these circumstances, as a matter of New York law, Crane had no duty to warn [the plaintiff] against the dangers of asbestos exposure" (*id.*, citing *Rastelli*, 79 NY2d at 297-298). It further stated:

"Asbestos was one of several materials that could have been used to insulate Crane products. While this might have made its installation on Pacific boilers foreseeable to Crane, there is no evidence that Crane played any role in choosing the type of insulation [the plaintiff] applied. Crane did not place into the stream of commerce the asbestos to which [the plaintiff] was exposed, and there is no evidence that Crane had any control over its production" (*id.*).

Finally, Crane cites *Tortoriello v Bally Case* (200 AD2d 475 [1st Dept 1994]). There, the plaintiff slipped and fell on the quarry tile floor of a walk-in freezer. She asserted a strict products liability claim against the manufacturer of the freezer, claiming that the floor was defective, although the manufacturer of the freezer did not ship it with the floor installed and had no knowledge of the type of floor installed. This Court held that the manufacturer's inclusion in its literature of quarry tile as one of three available floor materials for walk-in freezers was insufficient to establish liability, since there was "no evidence that [the manufacturer] had anything to do with the actual choice of flooring made by the architect and general contractor" (200 AD2d at 477).

These cases, and others cited by Crane, together stand for the rather unremarkable proposition that where there is no evidence that a manufacturer had any active role, interest, or influence in the types of products to be used in connection with its own product after it placed its product into the stream of commerce, it has no duty to warn. The cases cited by the *Dummitt* plaintiff, however, demonstrate that where a manufacturer does have a sufficiently significant role, interest, or influence in the type of component used with its product after it enters the stream of commerce, it may be held strictly liable if that component causes injury to an end user of the product. For example, in *Berkowitz v A.C. & S., Inc.* (288 AD2d 148 [1st Dept 2001]), this Court affirmed the denial of summary judgment to a manufacturer of pumps on Navy ships, although the plaintiff conceded that the manufacturer did not necessarily install asbestos on the pumps. According to the decision,

"While it may be technically true that its pumps could run without insulation, defendants' own witness indicated that the government provided certain specifications involving insulation, and it is at least questionable whether pumps transporting steam

and hot liquids on board a ship could be operated safely without insulation, which [the defendant] knew would be made out of asbestos" (288 AD2d at 149).

The *Dummitt* plaintiff also relies on *Rogers v Sears, Roebuck & Co.* (268 AD2d 245 [1st Dept 2000]). In *Rogers*, the plaintiffs were injured when a propane tank that one of them was attempting to attach to the barbecue grill manufactured by the defendant exploded. Although the defendant did not place the tank in the stream of commerce, this Court affirmed the denial to it of summary judgment, since "its grill could not be used without the tank" (268 AD2d at 246).

The facts here are much closer to those at issue in *Berkowitz* and *Rogers* than they are to *Rastelli, Drabczyk, Surre* and *Tortoriello*. In the former two cases, as in this case, there was sufficient evidence to tie the manufacturer directly to the injurious agent. At the same time, it cannot be said that, as in the latter set of cases, Crane was *indifferent to* the types of components that would be used. To the contrary, the evidence demonstrates that Crane influenced the Navy's choice of valve components following the initial shipment, and played a leading role in creating the culture and regulations that encouraged and eventually mandated the use of asbestos for insulation. First, Crane helped write the Navy's manual for machinery in 1946, "Naval Machinery," which specifically directed the use of asbestos for boiler-room component insulation. Second, Crane provided the Navy with detailed drawings specifying the components to use with each valve, to create a level of "standardization" so that the Navy would know which replacement component parts would be used with each valve. Many of the specifications for the type of valves on which Dummitt worked contemplated the use of asbestos. Lastly, while it did not manufacture the asbestos-laden components, Crane took certain asbestos-laden components that had been manufactured by a third party, rebranded them as "Cranite," and sold them as its own product. Indeed, the record is replete with examples of Crane, in its catalogs, extolling the virtues of Cranite and, by extension, asbestos-laden insulation products as the industry standard, from 1938 to at least 1962.

These facts collectively "strengthen the connection" between Crane's valves and the asbestos-containing components that made Dummitt sick (*see Surre*, 831 F Supp 2d at 801, citing *Rogers*, 268 AD2d at 245-246). Indeed, considering the substan-

tial interest Crane showed in having asbestos become the standard insulation in the components to be placed in its valves, it was entirely appropriate for the jury to find that Crane had the burden of warning workers such as Dummitt of the hazards of asbestos exposure.

■ Crane argues that the use of the word "foreseeability" in the jury charge was so prejudicial to it that, at the very least, a new trial is necessary. We disagree. There is a place for the notion of foreseeability in failure to warn cases where, as here, the manufacturer of an otherwise safe product purposely promotes the use of that product with components manufactured by others that it knows not to be safe. To be sure, mere foreseeability is not sufficient (see Surre, 831 F Supp 2d at 802 ["a duty to warn against the dangers of a third party's product does not arise from foreseeability alone"]). This explains why the manufacturer was absolved of liability in Rastelli, where it was not concerned with what type of rims would be used with its tires. However, this case is not even close to Rastelli because of Crane's demonstrated interest in the use of asbestos components with its valves. Accordingly, the charge as given had no potential to communicate the wrong standard to the jury.

■ We reject Crane's further argument based on the component parts doctrine.

> "[W]here a component part manufacturer produces a product in accordance with the design, plans and specifications of the buyer and such design, plans and specifications *do not reveal any inherent danger* in either the component part or the assembled unit, the component part manufacturer will be held blameless for an injury to the buyer's employee in a strict products liability action" (*Leahy v Mid-West Conveyor Co.*, 120 AD2d 16, 18 [3d Dept 1986], *lv denied* 69 NY2d 606 [1987] [emphasis added]).

Crane argues that its valves were merely components of the Navy ships on which they were installed. However, the component parts doctrine does not absolve Crane here because the evidence showed that Crane itself promoted its valves for use with asbestos parts, which could not be considered inherently safe.

■ On the question of causation, there was plainly a line of reasoning sufficient for the jury to conclude that Crane's failure to warn was a proximate cause of Dummitt's injuries. Dummitt testified that he was the staff liaison on his ships, responsible for enforcing safety procedures. Any warning would have been

received by him, and Dummitt clearly testified that he would have heeded those warnings and taken steps to protect himself and his boiler room crew. Accordingly, whether the court erroneously charged a presumption on the matter is irrelevant, because, as the dissent recognizes, Dummitt did not rely on any such presumption.

Further, we disagree with the dissent that Crane was prejudiced by the trial court's refusal to permit Admiral Sargent to testify about whether the Navy would have permitted asbestos warnings. Crane had made an offer of proof that, had Admiral Sargent been allowed to testify about the nameplates attached to valves sold to the Navy, he would have stated that the specification provided an exhaustive list of items to be included, and that the exclusion of hazard warnings from the list meant that the Navy had determined that it was not to be included. However, in a case with substantially similar facts, the Second Circuit rejected such a theory (*see In re Joint E. & S. Dist. N.Y. Asbestos Litig.*, 897 F2d 626 [2d Cir 1990] [hereinafter *Grispo*]). In that case, men who had worked at the Brooklyn Navy Yard during World War II had been exposed to asbestos. The Navy had issued detailed specifications for the packaging in which the asbestos-containing product had been shipped, and for the labeling on the packaging. Like Crane here, the contractor argued that "the relevant packaging, packing, and labeling specification for its asbestos-based cement . . . precluded it from furnishing product warnings" (897 F2d at 633).[3] The Second Circuit rejected this position, finding that the specification, which stated that shipping containers were to be "marked with the name of the material, the type, and the quantity contained therein, . . . the name of the contractor, the number of the contract or order, and the gross weight" (*id.* at 627) merely created a "floor" for the information the contractor had to provide (*id.* at 633). It found that "[j]ust as nothing in the relevant specification discusses product warnings, nothing in

---

**3.** The contractor's argument was part of a "[g]overnment contractor defense" that the United States Supreme Court recognized in *Boyle v United Technologies Corp.* (487 US 500, 513 [1988]). The defense displaces state law products liability claims "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States" (*id.* at 512). Crane raised the government contractor defense below but does not pursue it on appeal. Nevertheless, the logic of *Grispo* holds for Crane's proximate cause argument, which the trial court properly found was a mere "recast[ing]" of its government contractor defense.

the specification purports to place a limit upon any additional information a manufacturer may have wished to convey to those using the product" (*id.* at 633).

The record does not include the valve specification that was shown to Admiral Sargent during his testimony, and that he set forth the information that was required to be placed on a nameplate. However, the record does contain specifications for other parts, which have similar requirements for nameplates. For example, a specification for deaerating feed tanks[4] states that "[n]ameplates shall include the following: (a) Manufacturer's name; (b) Government contract number; (c) Bureau agency stock number . . . (d) Date of manufacture; (e) Blank space for Government inspector's stamp; (f) blank space for ship's identifying number." This specification is similar to the one in *Grispo*, and, as the court found in *Grispo*, nothing therein even remotely suggests that the Navy was precluding other relevant information, including warnings, that the contractor may have desired to add. Accordingly, we are not persuaded that it would have made a difference had the Admiral been permitted to testify that the nameplate requirements for valves was exhaustive.

Finally, Crane offered no evidence that it ever attempted to warn the Navy that its products carried the risk of exposure to asbestos. The Supreme Court in *Boyle* explained that this element of the government contractor defense

> "is necessary because, in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability. We adopt this provision lest our effort to protect discretionary functions perversely impede them by cutting off information highly relevant to the discretionary decision" (*Boyle*, 487 US at 512-513).

Although Crane does not invoke the government contractor defense on this appeal, the same policy concern applies. To permit Crane to argue lack of proximate cause in the absence of any evidence that it attempted to warn the Navy about asbestos

---

4. The section describing nameplates in the specification for deaerating feed tanks is located in the same section, 3.4, as the specification for valves that Admiral Sargent referred to during his testimony.

dangers would promote, rather than deter, the failure to warn about hazardous substances.

 Finally, the trial court properly calculated Konstantin's pain and suffering from late 2008 with the onset of the apple-sized hydrocele in his testes, which was caused by his mesothelioma. Accordingly, the 33 months of past pain and suffering was accurately calculated. The award for past pain and suffering of $4.5 million equates to $136,000 per month, plainly within the range of what even TLC argues is accurate. Moreover, Konstantin endured five surgeries, two rounds of chemotherapy, and one round of broad-ranged radiation. Konstantin testified that the swelling in his testicle was "very sore" and uncomfortable. It was also recurrent, swelling eventually to the size of an avocado. Eventually, he underwent the first surgery, to remove his testicle and part of his scrotum, which he claimed caused "extreme pain and swelling" and which he described as a "10 out of 10" on the pain scale. The asbestos then migrated to his pleura, requiring procedures to drain the fluid in his chest cavity. In addition, the scar from his testicle removal did not heal properly, requiring additional surgery, the pain of which the *Konstantin* plaintiff described as "unbearable." The jury's award of $3.5 million for 18 months of future pain and suffering, which Konstantin concedes is unprecedented, is supported by the fact that, until the end of his life, he suffered two mesotheliomas, in his testes and chest, tantamount to twice as much pain and suffering.

We also find that the award of damages to Dummitt was justified. The award is clearly supported by the evidence of the pain and suffering Dummitt endured over a 27-month period beginning at the age of 66. This included "thoracentesis" procedures to drain the fluid and relieve the pressure in his lungs, a complete lung collapse, thoracic surgery, and three rounds of chemotherapy. In addition, the remittitur of future pain and suffering to $2.5 million was appropriate under the circumstances.

Accordingly, the judgment of the Supreme Court, New York County (Joan A. Madden, J.), entered November 28, 2012, after a jury trial, awarding plaintiff Ruby E. Konstantin damages, and the judgment of the same court and Justice, entered October 26, 2012, after a jury trial, awarding plaintiff Doris Kay Dummitt damages, should be affirmed, without costs. The appeal from the order, same court and Justice, entered October 4, 2012, which denied defendant Crane Co.'s posttrial motion to

set aside the verdict, should be dismissed, without costs, as subsumed in the appeal from the October 26, 2012 judgment.

FRIEDMAN, J. (dissenting in part). Before us are appeals from judgments for plaintiffs in two unrelated asbestos-related personal injury actions that were consolidated for trial in Supreme Court, New York County. The majority affirms each judgment. I concur in the affirmance of *Konstantin v 630 Third Ave. Assoc.* (index No. 190134/10, appeal No. 11498), although, because we have not been provided with the record upon which the motion for consolidation was decided, I would not consider the argument by the appealing defendant (Tishman Liquidating Corporation) that the two actions should not have been consolidated. Upon the other appeal, *Dummitt v A.W. Chesterton* (index No. 190196/10, appeal Nos. 11499-11500), I respectfully dissent from the affirmance of the judgment for plaintiff because the trial court erred (1) in excluding certain evidence offered by the appealing defendant (Crane Co.) on the issue of causation and (2) in its charge to the jury on that issue. Accordingly, I would reverse the judgment for plaintiff in *Dummitt* and order a new trial on the issues of whether Crane's failure to issue warnings about the danger of asbestos-containing gaskets, packing, and insulation used with its valves was a proximate cause of the injury suffered by plaintiff's decedent and, if so, what percentage of fault is attributable to Crane.

I turn first to *Konstantin*. While I am in substantial agreement with the majority's resolution of the substantive issues raised on this appeal, I would not address Tishman's challenge to Supreme Court's pretrial order consolidating *Konstantin* and *Dummitt* for trial.[1] The consolidation order would be reviewable upon Tishman's appeal from the final judgment (*see* CPLR 5501 [a] [1]) if the record upon which that order was made were before us. Tishman, however, has not provided us with any of the papers upon which the consolidation order was made. Although it has prosecuted its appeal by the appendix system authorized by CPLR 5528 (a) (5) and 22 NYCRR 600.5 (a), Tishman has neither caused the original record of the consolidation motion to be transmitted to this Court by the clerk of Supreme Court, as required by 22 NYCRR 600.5 (a) (1), nor included the record of that motion in the reproduced appendix it has filed with this Court pursuant to CPLR 5528 (a) (5). All we have before us is the consolidation order itself. Tishman's failure to

---

1. Crane, the appellant in *Dummitt*, does not challenge the consolidation order on appeal, although it did oppose consolidation in Supreme Court.

place before this Court, in any form, any of the papers or exhibits submitted on the consolidation motion, either in support or in opposition, as required by CPLR 5526, renders "[m]eaningful appellate review of the [granting] of that motion . . . impossible" (*UBS Sec. LLC v Red Zone LLC*, 77 AD3d 575, 579 [1st Dept 2010], *lv denied* 17 NY3d 706 [2011]).

The majority appears to take the position that the record for the review of the consolidation order, while perhaps "incomplete," is "sufficient" to allow us "to meaningfully determine whether consolidation was properly granted." In fact, the record before us on the consolidation order is not merely "incomplete"; there is no record before us at all upon which to conduct a review of that order. The majority cites no authority permitting consideration of an appeal in the absence of any part of the record upon which the appealed order was made. Notably, while CPLR 5527 allows an appeal to be prosecuted upon a statement in lieu of a record on appeal, Tishman has not availed itself of that method, which would have required that the statement in lieu of the record be agreed upon by the parties and approved by the court from which the appeal is taken. I do not understand why the majority insists on addressing the consolidation issue on the merits, in the absence of any record, when we are all agreed that the *Konstantin* judgment should be affirmed. When before has this Court addressed an issue for which the parties have not seen fit to provide a record?[2] Had Tishman's appeal challenged only the consolidation order, Tishman's "fail[ure] in its obligation to assemble a proper appellate record" for review of that order would have warranted dismissal of its appeal for want of proper perfection (*UBS*, 77 AD3d at 579; *see also Matter of Allstate Ins. Co. v Vargas*, 288 AD2d 309 [2d Dept 2001]). Since Tishman's appeal raises additional issues unrelated to consolidation, I believe that we should decide those other issues without addressing Tishman's challenge to the consolidation order. Accordingly, while I concur in the affirmance of the judgment in *Konstantin*, I take no position on the views expressed by the majority in its discussion of the consolidation issue.

In *Dummitt*, as discussed at greater length by the majority, plaintiff's decedent, Ronald Dummitt, in the course of his work from 1960 to 1977 as a boiler-room technician on United States

---

**2.** In response to the majority's statement that the *Konstantin* plaintiff should have moved to dismiss the appeal or to supplement the record, I note that it is the obligation of the party seeking appellate relief—here, Tishman—to provide this Court with a record upon which to consider its appeal.

Navy ships, was exposed to asbestos from gaskets, rope-like "packing" material, and insulation (also called "lagging pads") installed on valves manufactured by Crane, the sole appealing defendant in this action. It is undisputed that Crane, which manufactured and sold the valves to the Navy many years before the start of Mr. Dummitt's service (the ships on which he served were of World War II vintage), has not been shown to have been the manufacturer, seller, or distributor of any of the asbestos-containing material that was the source of plaintiff's exposure.[3] The asbestos-containing gaskets, packing, and insulation used in conjunction with the Crane valves had to be replaced periodically, and any such material that Crane had originally supplied with the valves had been removed long before Mr. Dummitt began his service. Mr. Dummitt's asbestos exposure arose from the removal from the valves of worn-out gaskets, packing, and insulation, a process that generated large amounts of dust. Again, it is undisputed that Crane neither manufactured nor sold nor distributed the particular materials that gave rise to Mr. Dummitt's asbestos exposure.

The jury was asked to determine whether Crane had breached a duty to warn those working with its valves about the danger of asbestos in the gaskets, packing, and insulation used in conjunction with the valves. In this regard, the court propounded the following instruction to the jury, over Crane's objection: "[A] manufacturer's duty to warn extends to known dangers or dangers which should have been known in the exercise of reasonable care of the uses of the manufacturer's product with the product of another manufacturer if such use was reasonably foreseeable."

The foregoing instruction was erroneous, as the majority appears to recognize, but I think we should say so more forthrightly. Under precedent of this Court, a firm's duty to warn about dangers arising from products that it neither manufactured nor sold nor distributed, but which could be used in conjunction with products that the firm did manufacture, sell, or distribute, does not extend to all such uses of other products that might be "reasonably foreseeable." For example, in *Tortoriello v Bally Case* (200 AD2d 475 [1st Dept 1994]), we held that

---

**3.** While the majority notes that Crane did distribute and sell an asbestos-containing material known as "Cranite," which was manufactured by other companies, it was stipulated at trial that "Mr. Dummitt does not allege [that] he was exposed to asbestos from Cranite products."

the manufacturer of a walk-in freezer had no duty to warn users of the slipping danger posed by quarry tile flooring, manufactured and sold by others, that could be used in the freezer, notwithstanding that this kind of flooring was depicted in the freezer manufacturer's sales literature as "one of three available floor materials for walk-in freezers" (*id.* at 477). In view of that sales literature, it was plainly reasonably foreseeable to the manufacturer in *Tortoriello* that quarry tile flooring would sometimes be used in its walk-in freezers, and yet we held that the manufacturer had no duty to warn users of the freezers about the hazards of that kind of flooring.

The error in the court's instruction on the scope of Crane's duty to warn was, however, harmless, inasmuch as "there is no view of the evidence under which appellant could have prevailed" (*Marine Midland Bank v Russo Produce Co.*, 50 NY2d 31, 43 [1980]) on the issue of whether Crane had a duty to warn people working with the valves in question of the danger of asbestos exposure from gaskets, packing, and insulation used in conjunction with those valves. This is because the record establishes—indeed, Crane itself does not dispute—that use of perishable asbestos-containing materials in conjunction with certain of its valves was a known certainty, not merely "reasonably foreseeable." Crane emphasizes that the Navy, not Crane, chose which gaskets, packing, and insulation it would use on the valves, and points to evidence that non-asbestos-containing versions of these items were available and sometimes used by the Navy during the period in question. Nonetheless, the evidence is uncontroverted that, as Crane knew very well, Navy specifications dictated that asbestos-containing components be used with many of the Crane valves with which Mr. Dummitt worked. In a previous asbestos case, we held that a manufacturer of pumps on Navy ships was not entitled to summary judgment dismissing a failure-to-warn claim against it, notwithstanding that it did not manufacture or install the asbestos-containing insulation on its pumps, because an issue of fact was raised as to whether the manufacturer "knew [that the insulation to be installed on the pumps] would be made out of asbestos" (*Berkowitz v A.C. & S., Inc.*, 288 AD2d 148, 149 [1st Dept 2001]; *see also Rogers v Sears, Roebuck & Co.*, 268 AD2d 245, 246 [1st Dept 2000] [the manufacturer of a grill had a duty to give users adequate warnings about the dangers arising from the use of a

propane tank, which it did not manufacture or sell, "where its grill could not be used without the tank"]).[4]

Although I believe that the *Dummitt* plaintiff is entitled, on this record, to prevail on the issue of duty, I believe that errors relating to the issue of proximate cause require us to reverse the *Dummitt* judgment and order a new trial as to causation-related issues. First, over Crane's objection, the trial court's charge to the jury on the issue of proximate cause erroneously included the following instruction: "Mr. Dummitt is entitled to the presumption that had proper and adequate warnings been given regarding the use of the product, the warnings would have been heeded and injury avoided." This charge is contrary to precedent of this Court holding that, in a failure-to-warn case, the plaintiff has the burden of proving "that the user of a product would have read and heeded a warning had one been given" (*Sosna v American Home Prods.*, 298 AD2d 158, 158 [1st Dept 2002]). Further, to the extent certain federal court decisions purporting to apply New York law have applied such a presumption (contrary to this Court's precedent), that presumption is rebuttable (*see Santoro ex rel. Santoro v Donnelly*, 340 F Supp 2d 464, 486 [SD NY 2004]), which is not the charge the jury was initially given. While the court subsequently attempted to cure its error by adding that the presumption could be rebutted,[5] it remains the case that, regardless of what some trial courts and federal courts applying New York law may have held, this Court has never held such a presumption, whether rebuttable or not, to apply in a personal injury case based on a failure-to-warn theory. Further, since the erroneous presumption charge was part of the instructions the jury actually received, it was prejudicial to Crane whether or not counsel for the *Dum-*

---

4. By contrast, in an asbestos case against Crane in which the United States District Court determined that the record would not have supported a finding that Crane knew for certain that the Navy would place asbestos-containing insulation on its boilers, the court granted Crane summary judgment dismissing the failure-to-warn claim, distinguishing our decision in *Berkowitz* on the ground that the latter case "involved more than a mere possibility that asbestos might be used" (*Surre v Foster Wheeler LLC*, 831 F Supp 2d 797, 802 [SD NY 2011]).

5. After the initial charge, the court called back the jury and added the following "clarification" concerning the presumption the jury had been instructed to entertain in plaintiff's favor: "This, however, is a rebuttable presumption. In other words, you can consider other evidence in the case to see if that other evidence rebuts this presumption to which Mr. Dummitt is entitled."

*mitt* plaintiff—who requested the charge—made express reference to it in his argument to the jury.[6]

I do not believe that the error in the charge on causation can be deemed to have been cured by the court's subsequent "clarification" that the presumption the jury had been instructed to indulge in the *Dummitt* plaintiff's favor was rebuttable. Whether rebuttable or not, the presumption charge had the effect of shifting the burden of proof on the causation issue and was contrary to precedent of this Court by which the trial court was bound. However, even if it were possible to deem the erroneous instruction to have been rendered harmless by the curative instruction, the trial court compounded its error by improperly precluding Rear Admiral David Sargent, U.S.N. (ret.), who was called by Crane to testify as an expert on naval operations, from giving testimony highly relevant to the question of whether Crane's failure to give asbestos warnings was a proximate cause of Mr. Dummitt's injuries. Specifically, Crane sought to show through Admiral Sargent's testimony how the Navy would have reacted to an attempt by Crane to issue warnings about the dangers of asbestos used on its valves. This witness was prepared to testify that the Navy would have forbidden Crane to place asbestos warnings on its valves because they were not contained in the Navy equipment specifications. Although this testimony would have tended to show that the hypothetical warnings, even if given, would not have reached Mr. Dummitt, the court refused to allow the jury to hear it.

I do not take issue with the majority's statement that the *Dummitt* plaintiff presented evidence that Mr. Dummitt would have received "[a]ny warning . . . and . . . clearly testified that he would have heeded those warnings and taken steps to protect himself." Still, Crane was entitled to present its own proof rebutting this evidence, as well as the presumption that the

---

**6.** *Union Carbide Corp. v Affiliated FM Ins. Co.* (101 AD3d 434 [1st Dept 2012]) did not change this Department's law on this point. *Union Carbide* was an insurance coverage dispute, in which the insurer sought to avoid coverage for asbestos-related bodily injury claims against the policyholder on the ground that the policyholder "expected or intended" the injuries giving rise to the claims (*id.* at 434). In rejecting the insurer's appeal, we noted that the policyholder "offered, as further proof of any lack of intent, evidence that it . . . provided information regarding the dangers of asbestos, as well as guidance concerning its proper usage, to its clients and potential customers," after which we cited *Santoro* for the proposition that "New York law presumes that users will heed warnings provided with a product" (*id.*). In the context of the issue that was before us in *Union Carbide*, that decision's citation of *Santoro* and recitation of the *Santoro* holding was plainly dicta.

jury had been erroneously instructed to indulge in the *Dummitt* plaintiff's favor. Given that the excluded evidence was relevant and material, its preclusion constituted reversible error.

The majority mistakenly relies on a nearly quarter-century-old federal court decision—which neither side has cited on this appeal—in support of its view that the trial court's preclusion of Admiral Sargent's testimony did not constitute reversible error. In fact, *In re Joint E. & S. Dist. N.Y. Asbestos Litig.* (897 F2d 626 [2d Cir 1990] [hereinafter *Grispo*]) provides no support either for the preclusion of Admiral Sargent's testimony or for the majority's inappropriate and groundless speculation that this expert witness's testimony "would have made [no] difference" to the outcome of the trial had the jury been allowed to hear it. In *Grispo*, while the Second Circuit affirmed the denial of summary judgment to the defendant cement manufacturer (Eagle-Picher) on its military contractor affirmative defense, it also vacated the grant of summary judgment to the plaintiffs dismissing that defense and remanded for reconsideration by the District Court of whether certain evidence in the record "establish[ed] a genuine issue of material fact [whether] the Government might have precluded Eagle-Picher from including any product warnings" (*id.* at 637). At the trial of the *Dummitt* case, on the other hand, the court effectively granted the plaintiff summary judgment on the issue of causation by refusing to allow the jury to hear Admiral Sargent's expert testimony, based on his knowledge of the Navy's practices during the relevant period, that any warnings by Crane about the use of asbestos-containing materials in conjunction with its valves would not have reached Mr. Dummitt. Nothing in *Grispo* supports the preclusion of this testimony, since there is no indication in the Second Circuit's opinion that Eagle-Picher offered expert testimony similar to that of Admiral Sargent in support of its military contractor defense. Thus, while the *Grispo* court was unpersuaded by the raw documentary evidence Eagle-Picher offered in support of the defense (*see id.* at 632-633), it had no occasion to consider whether expert testimony about military practices, such as Crane sought to present to the jury here, would raise an issue of fact. Manifestly, Admiral Sargent's testimony—which is not even mentioned in the portion of the *Dummitt* plaintiff's appellate brief addressing the causation issue—raised such an issue and should have been heard by the jury. There is nothing in *Grispo* that suggests otherwise.

The majority also apparently takes the position that Crane's failure to present evidence that it warned the Navy about the

dangers of asbestos in materials used with its valves should preclude Crane from contesting that its failure to provide such warnings to naval personnel was a proximate cause of the harm to Mr. Dummitt. Even if one joins the majority in its dubious assumption that the Navy (unlike its product vendors) was in the dark about the dangers of asbestos during the relevant period, what the majority overlooks is that Admiral Sargent would have testified, based on his long experience in naval procurement practice, that, even if Crane had sought to provide such warnings, the Navy would have disallowed them. Stated otherwise, the Navy, according to Admiral Sargent, would have been unmoved by any warnings presented by Crane for transmission to servicemen like Mr. Dummitt. The jury might well have rejected Admiral Sargent's testimony on this point, but Crane had a right to present it to them. The preclusion of this expert testimony (the admissibility of which the *Dummitt* plaintiff does not dispute) constituted reversible error.

Finally, given my view that a new trial is required on the question of whether Crane's failure to give warnings was a substantial factor in causing Mr. Dummitt's injuries, I would direct that, should the causation issue be resolved in the *Dummitt* plaintiff's favor, the issue of Crane's percentage of fault for the harm suffered by the plaintiff and her decedent be determined afresh at the new trial.

RICHTER and MANZANET-DANIELS, JJ., concur with MAZZARELLI, J.P.; FRIEDMAN, J., dissents in part in a separate opinion in which DEGRASSE, J., concurs.

Judgments, Supreme Court, New York County, entered November 28, 2012, and October 26, 2012, affirmed, without costs. Appeal from order, same court, entered October 4, 2012, dismissed, without costs, as subsumed in the appeal from the October 26, 2012 judgment.